*Saturday,*
*April 1st.*

## WILT *against* FRANKLIN, Assignee of KEELY. BERTHON and Son *against* KEELY.

On the same evening, after a considerable verdict is obtained against *A,* he conveys all his property to a trustee of his own choice, for the benefit of all his creditors, in equal proportions. The trustee lives at a distance, and does not hear of the deed until four days afterwards, when he assents. No possession of the title deeds is given until nearly two months after; and the debtor continues in possession of the furniture and goods, the next day after the ex-

THE plaintiff *Wilt* levied upon the property of *Keely,* which he had previously assigned for the benefit of his creditors; and the proceeds of sale were paid to *Keely's* assignee by the sheriff. Mr. *Franklin* conceived himself entitled to distribute the money agreeably to the assignment; *Wilt* denied the validity of the assignment, and claimed the money exclusively. To determine these conflicting pretensions, this action for money had and received was agreed to be entered, and tried under the general issue, which accordingly was done before *Yeates* J. at a nisi prius in *February* 1807, when the jury returned the following special verdict.

The jury find " that an action on the case was instituted in the supreme court of *Pennsylvania* by the said *Abraham Wilt* against the said *Matthias Keely;* and that on the 3d day of *March* 1804, at a court of nisi prius holden, &c., a jury duly sworn and affirmed found by their verdict to be due to the plaintiff *Wilt,* by the defendant *Keely,* the sum of 9,062 dolls. 15 cents. That this verdict was given in at *about 4 o'clock P. M. of Saturday* the said third day of *March* in the same year. That immediately afterwards, on the afternoon of the same day, by directions of a certain *Charles P. Heath,* the son in law of the said *Matthias Keely,* and on his behalf, a certain deed of bargain and sale was drawn by a scrivener in the said city, for the purpose of transferring the real and personal

ecution of the deed, which was *Sunday,* and part of *Monday,* when they are seized in execution. The deed contains no schedule of property, and no limitation of time, for distributing the estate. *Held,* that it is a valid deed, and takes effect from its execution, as the assent of the trustee is presumed; delivery of title deeds is unnecessary, and nondelivery of goods is explained.

If a bargain and sale recite a consideration of money, and the jury find no money was paid, this part of the verdict goes for nothing. No averment lies against such a recital in the deed.

1809.

WILT

*v.*

FRANKLIN.

estate of the said *Matthias Keely* to a certain *John Bartholomew; and on the night of the same day between* 9 *and* 10 *o'clock P. M. the said deed of bargain and sale was signed by the said* Matthias Keely *and wife, in the presence of two witnesses, and acknowledged before* Frederick Wolbert, *esquire, in the same room, and immediately after the signing*. That the said *John Bartholomew was not present at the said time and place of signing, nor had he any knowledge beforehand that any such deed was to be, or would be, executed. That the said* John Bartholomew *was not a creditor* of the said *Matthias Keely*. That he resided at that time in *Chester* county, in this commonwealth, at the distance of about three and twenty miles from the city of *Philadelphia* aforesaid, *and never heard or knew of the said supposed assignment until* Wednesday, *the* 7*th day of the same month of* March, when the same was shewn to him at his dwellinghouse in the said county of *Chester*, by a certain *George Dantzman*, who was sent to him with the assignment and a letter by the said *Keely*. That the said *John*, on receiving the said letter and assignment, said to the said *George*, after perusal of the said papers, that he was a friend of Mr. *Keely's* family, and was willing to oblige him in this respect: *that he was very willing to serve*, but that his illness would prevent him from coming to the city." The jury further find " that *no money was paid to the said* Keely *by the said* Bartholomew *on the said* 3*d of* March, *or at any time afterwards;* and that *no possession of the goods or lands, books or writings of the said* Matthias Keely *was delivered by him to the said* John, *on the said* 3*d day of* March, *or at any time afterwards*. That the family of the said *Matthias* continued to reside in his said dwellinghouse after the said supposed assignment; and that *the said* Matthias *continued in possession of his goods and furniture until* Monday *the* 5*th day of* March *aforesaid, when the sheriff of the city and county of* Philadelphia *levied on the goods and furniture* of the said *Matthias*, at the suit of a certain *Peter Berthon* and *son*, and took the same into custody." The jury further find " that on *Monday* the 5th day of *March* in the same year, being the first day of the *March* term of the said supreme court, judgment was entered in the same court, on the said verdict, against the said *Keely*. That on the 7th day of the same *March*, the same *Matthias Keely* was arrested and confined for debt in the prison of the city and county of *Phi-*

*ladelphia.* That on the 10th day of *March* in the same year, the said *John Bartholomew* assigned the premises mentioned in the said supposed conveyance of the 3d of *March* to a certain *Thomas Allibone* and *Caleb North*, who afterwards assigned to the said *Walter Franklin*, the defendant. *That the said* Caleb North *and* Thomas Allibone *were authorized by a meeting of the creditors of the said* Matthias *to take the said assignment from the said* John. The jury further find " that two messuages of the said *Matthias Keely*, in the city of *Philadelphia*, were levied upon by the sheriff, under the execution of the said *Abraham;* but *that the title deeds of the said two messuages or of any other real estate of the said* Matthias Keely, *included in the first assignment aforesaid, were not delivered by him, or his order, to the said* John Bartholomew *at any time, but remained in his own house,* where his family continued to reside, and were by him brought into the court of common pleas on the 26th *April* 1804, and surrendered. And that the said *Matthias Keely*, or a certain *Charles P. Heath*, his son in law, *had in his or their possession the said supposed assignment of the 3d of* March *until the evening of the 6th of* March, when it was put into the hands of the said *George Dantzman*, in *Philadelphia*, to be delivered to the said *John*, in *Chester* county. And that the said *Matthias Keely* on the 8th day of *March*, in the same year, petitioned the court of common pleas of *Philadelphia* county, on which such proceedings were had [*prout proceedings*]. If upon the whole matter the law be in favour of the plaintiff, then the jury find for the plaintiff, and assess damages to 2,037 dollars 58 cents, and 6 cents costs; if the law be in favour of the defendant, then they find for the defendant."

The case of *Berthon* and *son* against *Keely*, it was agreed by counsel should be decided on the same argument with *Wilt* and *Franklin;* and that the preceding special verdict should be considered as existing in the case, as far as it applied, with this additional fact, that the sheriff under the seizure found by the verdict, proceeded to sell the goods so seized, and had paid the proceeds into this court. The question in this case was therefore, whether *Berthon* and *son* should not be at liberty to take the money out of court.

Both cases turned upon the validity and relation of the deed of 3d *March* 1804; by which, *Keely* and wife, *in consideration*

*of one dollar*, bargained and sold *his whole real and personal* estate to *Bartholomew*, in trust that he should " forthwith take " possession and seisin of the premises, and within such con- " venient time as to him should seem meet, by public or private " sale for the best price that could be procured, convert all and " singular the estate real, personal, and mixed, into money, " and as soon as possible collect all and singular the debts and " sums of money above assigned, and after deducting the costs " and charges of the trust, should pay and apply all the money " arising therefrom" *to and among all the creditors of* Keely, *in equal proportions;* the surplus, if any, to be returned to him. The deed also gave power to *Bartholomew* to convey part or the whole of the property to *one or more trustees under the control and direction of* Keely's *creditors*, upon the same trusts as were mentioned in the original assignment. And under this direction and control, *Bartholomew*, on the 10th *March* 1804, conveyed the whole to *North* and *Allibone*, and they on the 13th *June* 1804 to Mr. *Franklin*, the defendant; but the deed *did not contain or refer to any schedule* or list of the property and debts assigned, or of the debtors and creditors. It was recorded on the 28th *August* 1804.

1809.<br>WILT<br>v.<br>FRANKLIN.

The cause was argued at *March* term 1808.

*Phillips* and *M. Levy* for *Wilt*. *Tod*, for *Berthon* and *son*. Upon this special verdict we make two points. 1. Under the facts stated in the verdict, the deed of the 3d *March* 1804 is fraudulent and void. 2. Supposing it to be valid, it had no operation until the assent of the trustee, on the 7th of *March*, and therefore does not cut out our intervening judgment, and execution.

1. The deed is fraudulent and void, because it was intended to defeat the verdict which *Wilt* had obtained on the same day,—because it was not attended by delivery of possession,—because the trustee was not a creditor, and was chosen by the debtor,—because there was no money paid by *Bartholomew* to *Keely*,—because there is no schedule of the property,—and because no time is limited for the execution of the trust.

To render a deed fraudulent by the *stat.* 13 *Eliz. c. 5.* the *mala mens* need not appear from positive proof. If its necessary effect is to delay, hinder, or defraud creditors of their just and lawful suits and debts, the law pronounces the deed to be

fraudulent, from the mischief that results, and does not ask for direct proof of covinous intention. The facts of this case are short. On the night of the same day on which *Wilt* obtained his verdict, at an unusual hour, and without consulting a creditor, *Keely* conveys away all his property upon earth. The judgment was to become absolute in four days; and therefore the *first* objection to the deed is, that it was to delay, hinder, and defraud *Wilt* of the just benefit which the law was about the next moment to confer upon his vigilance, in the language of the statute, " to the let and hindrance of the due " course and execution of law and justice." The manifest view was to defeat this creditor; and therefore even if it had been for a valuable consideration, given by a person conusant of the facts, the law would overthrow it, according to the case put in *Cadogan* v. *Kennett.* (a)

No possession of the property was delivered to the grantee. This is our *second* objection. There is no circumstance that goes more directly to the point of fraud, than the grantor's continuing in possession of his property, after he has assigned it by an absolute deed. Even where it is made for a valuable consideration, it is bad; as in *Twyne's case,* (b) where the conveyance was in satisfaction of a debt due to the grantee; and in *Hungerford* v. *Earle,* (c) where the grantor conveyed to trustees to pay debts, and to raise portions. It is not merely evidence; it is a circumstance *per se,* which, in point of law, renders the deed fraudulent. In *Edwards* v. *Harben* (d) it is stated by *Buller* J. that upon a consultation with all the judges, in the case of *Bamford* v. *Baron,* they were unanimously of opinion, that unless possession accompanies and follows the deed, it is fraudulent and void; and that where a bill of sale on the face of it is absolute, and to take place immediately, possession must be *immediately* delivered, or the deed is fraudulent. The principal case was argued by the counsel of the grantee, as being one in which the want of possession was only evidence of fraud, and that it was not such a circumstance, *per se,* as made the transaction fraudulent; but the answer of the court was, that *that* was the point they had considered; and they were all of opinion, that if there was nothing but the

(a) *Cowp.* 434.                    (c) 2 *Vern.* 261.
(b) 3 *Co.* 80.                      (d) 2 *D. & E.* 587.

*absolute conveyance without the possession*, that in point of law was fraudulent. It is also to be remarked in our case, that there was no counterpart of the deed of the 3d of *March*, and that the original was in the custody of *Keely* until the evening of the 6th; during which time he might have destroyed it. The title deeds also were in his hands until the 26th *April*. These facts bring us within the principle of *Wilson* v. *Day*, (*a*) and also within that of *Tarback* v. *Marbury*. (*b*)

The *third* objection is, that the trustee was not a creditor, and was chosen by the debtor. The impropriety of allowing a debtor, involved in inextricable embarrassment, and pursued to the verge of execution, suddenly to withdraw his property, and to place it in the hands of a friend, who can feel no common interest with the creditors, and must entertain a bias to the accommodation of the debtor, is not to be overlooked. It not only shews the fraudulent intent, but it contributes to the fraudulent effect. It turns round the creditors to a person against whom they have little or no remedy, and who, in all cases of collision between them and the debtor, will act in the spirit of his appointment, by baffling them with every impediment that the debtor's interest may suggest. Accordingly in *Burd* v. *Fitzsimmons*, (*c*) it was mainly relied upon by the judges, who decided against the deed; and in *Alderson* v. *Temple*, (*d*) it was the opinion of lord *Mansfield* that it would be an act of bankruptcy in a debtor, to convey his estate to trustees of his own choosing. If so, it must be bad at common law, as it must proceed upon the ground of fraud.

Another objection is that no money was paid by the grantee; there is therefore no consideration to raise a use. 2 *Bl. Comm.* 330. *Monnington* v. *Williams* (*e*), *Stream* v. *Seyer* (*f*), *Sargent* v. *Reed* (*g*). The consideration is of the essence of this kind of conveyance. 2 *Inst.* 671. It is true, after verdict, a consideration will be presumed to have been proved; but here the receipt of a dollar is negatived by the special verdict, and the presumption is rebutted.

The *fifth* defect of this assignment is the want of a schedule. Courts of justice, keeping in view the principles of the common

(*a*) 2 *Burr.* 830.　　(*d*) 4 *Burr.* 2240.　　(*g*) 2 *Stra.* 1229.
(*b*) 2 *Vern.* 510.　　(*e*) 1 *Ventr.* 108.
(*c*) 4 *Dall.* 77　　(*f*) 1 *Ld. Ray.* 111.

law, as well as the statute 13 *Eliz.*, will not suffer themselves to be deceived by the honest appearance of a deed of trust, if it is wanting in those provisions which are essential to the execution of it, and which are necessary to render the trustee and *cestui que trust* independent of the grantor. When real estate is conveyed, the trustee should know its situation and amount, either from the deed, or from something to which it refers; *a fortiori* where debts are assigned, since without some specification, the pursuit of them is hopeless. This was a circumstance relied upon in *Burd* v. *Fitzsimmons*, and with great propriety.

Finally, no time is limited for the execution of the trust. If such a conveyance as this can be supported, it must be because it is for the benefit of creditors. It can never be for their benefit, that the property of the debtor, in whose hands it is subject to execution after a limited delay, should be given to a trustee to apply it for their use, only when he shall think proper. It is substituting, for the delay of a few months, a delay without limit.

2. But supposing the deed to be valid, it did not take effect until the 7th of *March*, when the trustee assented. This assent was clearly necessary to give operation to the deed. But it cannot carry the deed back by relation. Relations are not to do wrong to strangers; they are fictions in law, which are always to be accompanied by equity. Nor is such assent to be presumed. Where a deed is for the benefit of the grantee, no doubt the presumption exists; it is highly reasonable. But where the deed imposes an unprofitable duty, the presumption ought to be the other way. The case is all the stronger for us, because the trustee is not a creditor; he is here to perform a duty without reward, and he covenants for the performance of the duty by accepting the trust. There is no case in which assent to such a deed has been presumed. The time of delivery therefore, according to lord *Ellenborough*, in *Hall* v. *Casenove*, (a) is the important time when it takes effect as a deed.

*Rawle* and *Ingersoll* for the defendant. It is the policy of all civilized countries to favour an equal distribution among

(a) 4 *East* 481.

the creditors of an insolvent debtor. The embarrassment to commerce, and the ruin to individuals, which spring from large preferences, either given to, or compelled by, a single creditor to the exclusion of the rest, have every where led to bankrupt and insolvent laws; until at last we may say that general assignments are favourites of the law, and will be supported by every reasonable intendment. If then the deed in question is bad, it is either because it is fraudulent upon moral principles, or is contrary to the provisions of the statute. It surely is not against the general policy of the law.

Fraud, upon moral principles, is not found by the verdict. It is not to be presumed; and in fact it is negatived by all the proceedings of the debtor. His object was to convey *all* his property, for the equal benefit of *all* his creditors, without any trust or reservation for himself, and without stipulating for a release. His creditors were to control the trust, by appointing subsequent trustees; and they might order the distribution in the manner and time they pleased. In what respect does this differ from an assignment under the insolvent laws, except that the debtor remains exposed to execution, and has not claimed the protection which the law would have granted him. It is not contrary to the statute. To make a deed fraudulent within the 13 *Eliz.* there must be an actual *mala mens*, which cannot be presumed, but must be proved, and found by the jury; as it was resolved in the *Chancellor of Oxford's case.* (a) The circumstance, of its being voluntary and without consulting the creditors, is of no consequence; for there are many cases and opinions, that a deed of trust may be voluntary, and yet not fraudulent; as in lord *Teynham* v. *Mullens* (b) and in *Russel* v. *Hammond.* (c) Lord *Mansfield*, in delivering his opinion in *Cadogan* v. *Kennett*, (d) says that such a construction of the statute is not to be made in support of creditors, as will make third persons sufferers; and therefore the "statute does not mili-
" tate against any transaction *bona fide, and where there is no*
" *imagination of fraud.*" Whether voluntary or otherwise, therefore, is not the question; but whether it is a *trick* or *contrivance* to defeat creditors. The statute goes wholly upon the ground of

(a) 10 Co. 56.          (c) 1 Atk. 15.
(b) 1 Mod. 119.        (d) Cowp. 434.

1809.

WILT

v.

FRANKLIN.

*intended* fraud. It speaks, in the preamble, of feigned, covinous, and fraudulent conveyances, *devised and contrived of malice.* The parties are made criminal, and are punishable by information; and the 6th section expressly protects such deeds as are made upon a good consideration, and *bona fide.* It may be upon a good consideration, and yet fraudulent, as in *Twyne's case;* which was a criminal prosecution, and where the deed was evidently designed to cheat the other creditors of *Pierce;* but if it is done *bona fide,* it is impossible that there can be fraud within the statute. The cases from the *English* books, where an honest intention was held not to save the deed, are cases within the statutes of bankrupt; the deeds were deemed to be frauds upon those statutes. But they could not be bad at common law, or by the *stat.* 13 *Eliz.*; to come within which, the feoffment must be devised of malice, fraud or the like. *Meux qui tam* v. *Howell.* (*a*)

But it is said this deed was intended to defeat and delay the creditor who was about to obtain an execution; and that this is fraudulent. We deny the position. The object was to prevent one creditor from grasping every thing to the exclusion of the rest; and this was perfectly honest, and is supported by many authorities. Surely on the afternoon of *Saturday, Keely* might have given property to one creditor in satisfaction of his debt, bankrupt laws out of the case; *a fortiori* might he give it for the benefit of all his creditors. *Nunn* v. *Wilsmore.* (*b*) The approaching judgment was nothing; and to this, and indeed to all the objections against the intent and effect of the deed, the cases of *Holbird* v. *Anderson,* (*c*) and *Meux* v. *Howell,* are in point. The delay is honestly and lawfully produced to obtain an equal distribution among all who are entitled.

Then as to the particular defects which are relied upon as badges of fraud:

No *possession* was delivered. So far as it respects the title deeds, none was necessary. Our recording acts have made the possession of the deeds, immaterial. And *Keely* could not have destroyed the principal deed, since it was well known by its execution before witnesses, and by its acknowledgment before a judge, who took the privy examination of the wife. As it re-

(*a*) 4 *East* 1.     (*b*) 8 *D. & E.* 528.     (*c*) 5 *D. & E.* 235.

spects personal property, it is a mere evidence of fraud which may be rebutted by circumstances; and so are the cases cited. In *Edwards* v. *Harben* the deed called for immediate possession, and the grantor verbally stipulated for a possession of fourteen days. What the court say is therefore with relation to such a contract, and they thought proper to treat it as full evidence of fraud; but it does not resemble the present case. They held *immediate* possession to be necessary; but this does not exclude all mesne acts; it implies convenient time without delay, as in *Rex* v. *Francis;* (a) and there was clearly no delay here. The deed was executed on *Saturday* night; *Sunday* was not a day for business; and on *Monday*, *Berthon's* own execution made a delivery impossible. There was no stipulation that the grantor should remain possessed; and the obstacle to delivery was the conduct of one of the parties who now set up the objection.

The next is the appointment of his own trustee, not a creditor. This also is a mere circumstance. Cases may occur in which such an appointment would be almost conclusive evidence of fraud. But here the very deed provides for an appointment by the creditors; and therefore the argument of possible fraud and mismanagement fails. Besides, the trustee would have been amenable to the creditors, without this provision, by our act of assembly. 1 *St. Laws* 690.

Another is, that no money was paid by the trustee. The deed expresses, first, the consideration of debts; which is a special and a valuable consideration. *Nugent* v. *Gifford.* (b) Secondly, the receipt of one dollar, though the jury negative it. It is however clearly settled, that if the deed make mention of money paid, and in truth no money is paid, yet the bargain and sale is good; *and no averment will lie against this which is expressly affirmed by the deed. Shep. Touch.* 223.

Another is, the want of a schedule. There is no case in which this has been a substantive objection to the deed. Here the deed was an authority to demand the books, which would be the best schedule, since every thing was conveyed; and although the omission of the document was relied on in *Burd* v. *Fitzsimmons,* yet it is to be observed, that the reasons of the

1809.

WILT
v.
FRANKLIN.

(a) *Stra.* 1019            (b) 1 *Atk.* 463.

1809.

WILT
v.
FRANKLIN.

judges for overthrowing that assignment were different. The court was divided three to two upon the main question; and they took all the minor objections in connexion with the strong and peculiar feature in that deed—a resulting trust to the debtor before the creditors were paid.

It is also urged that no time is limited for the distribution. The act of assembly furnishes a remedy against improper delay. There is moreover no limitation of time in the assignments under the insolvent laws; and all that the debtor could do, he has done, by requiring the distribution to be made as soon as possible.

The only remaining point is the relation of the deed. It is conceded that the acceptance of the grantee is to be presumed, when the deed is for his benefit. This deed, it is true, is neither a gift nor a reward; but it is the creation of a trust in the grantee, which it is merely an act of justice, and a performance of the social duty each man owes to the community, to accept. The law will therefore presume an assent, until a disagreement is shewn. It is not a question, whether the deed relates back so as to cut out mesne acts, but whether the estate was not out of the grantor, *eo instanti*, the execution was complete; and to this point, the case of *Thompson* v. *Leach* is full. (*a*)

. *Reply.* The case of *Thompson* v. *Leach* is of very doubtful authority. The opinion of *Ventris*, upon which the defendant's counsel rely, was opposed by three judges in the common pleas, whose judgment was affirmed by the king's bench; and although this judgment was reversed by the house of lords, there were ten judges against the reversal. But give it its full weight: The whole argument of *Ventris* is upon conveyances at common law; and he expressly avoids saying any thing of conveyances that work by the statute of uses. 2 *Ventr.* 201. Even such conveyances at common law, as require some reciprocal act from the grantee, he excepts out of those to which his assent is implied, as exchanges. And in the present case, as the trustee covenants for the performance of the trust by accepting it, it is a reciprocal act, not formal, but

(*a*) 2 *Ventr.* 198. 1 *Show.* 308. *S. C.*

substantial; and therefore comes fully within the exception of *Ventris*.

*Cur. adv. vult.*

Upon this day the judges delivered their opinions.

TILGHMAN C. J. These causes come before the court on a special verdict, found in the action in which *Wilt* is the plaintiff. In the action by *Berthon* and *son*, it is agreed, that it shall be decided on the facts found in the verdict in *Wilt's* suit.

Two points were made by the counsel for the plaintiff. 1. That under the circumstances stated in the verdict, the deed from *Matthias Keely* to *John Bartholomew* is to be considered as fraudulent and void. 2. That supposing it to be good, it had no operation till the 7th of *March*, when it was first made known to *Bartholomew*, and received his assent.

In support of the *first* point, it was contended that the deed was void by the *stat.* 13 *Eliz. c. 5.*, and by the principles of the common law; because it was made with an intent to defeat the action of *Wilt*, who had obtained a verdict against *Keely* the same day the deed was executed; because it was not attended with delivery of possession of the property conveyed; because it vested the management of *Keely's* whole estate in a trustee of his own choosing; because there was no schedule of the property; and because no money was paid by *Bartholomew* to *Keely*.

I will consider this subject under two points of view, which will include the different positions taken by the plaintiff's counsel.

1. What was the intent of the parties?

2. In what manner has their intent been carried into effect?

1. As to *Bartholomew* the grantee, there is no intimation of his having entered into any improper collusion with *Keely*. He knew nothing of the deed till after its execution; and it does not appear that he was any way interested in it. The manifest intent of *Keely* was to prevent *Wilt* from obtaining any preference by his judgment, and to put all his creditors, without exception, on an equal footing. There appears to be nothing immoral or unfair in such intent. On the contrary, it is the object of well regulated societies, where commerce flourishes, to obtain an equal division of the property of insolvent traders.

1809.

WILT

v.

FRANKLIN.

The statute of 13 *Eliz. c. 5.* (the provisions of which go no further than the common law as *now* understood) never had it in contemplation to invalidate a *fair* transaction. It was made to avoid fraudulent conveyances, intended for the purpose of defeating, hindering, or delaying creditors of their just debts. The parties to such conveyances were considered as criminal, and subject to a penalty, to be recovered by action of debt or information. The statute is declared to be made for the purpose of avoiding " feigned, covinous, and fraudulent " conveyances, bonds, suits, judgments, and executions, which " were devised and contrived of malice, to the end, purpose, " and intent, to *delay, hinder,* or *defraud* creditors and others " of their just and lawful actions, suits, debts," &c. &c. There is nothing in the *statute* to hinder a man from giving a *preference* to any creditor he pleases, *before* or even *after* an action brought against him. It was never supposed that it would prevent an executor from preferring one creditor to any other of equal degree, by a voluntary confession of judgment, although the creditor, who brought the *first suit*, was thus *entirely defeated*. An executor indeed could not give a preference to a debt of an *inferior* nature; but that was because he would thereby be guilty of a *devastavit:* a reason which does not apply to the case of debtor and creditor who are both living. It was expressly decided in *Holbird* v. *Anderson, 5 D. & E. 235.*, that a debtor, being sued to *judgment* by one of his creditors, might, before the time when execution could be taken out, prefer another creditor by a voluntary confession of judgment, by virtue of which an execution was immediately sued out, and levied on the goods of the debtor. In *Nunn* and *Ladbrook* v. *Wilsmore, 8 D. & E. 529, 530.*, lord *Kenyon* declares his opinion, that, " putting the bankrupt laws out of the case, a " debtor may assign all his effects for the benefit of particular " creditors." Now, if preferences of this kind are lawful, much more so is an act which gives a *preference* to *no* creditor, but *prevents* any one from obtaining a *preference*, and puts *all* on an *equal footing*. It may be objected, that this case comes within the words of the statute, because *Wilt* has been *hindered, delayed*, and in part *defeated*, by this deed. It is true he has been delayed and partly defeated, but not in a fraudulent manner. We must give the statute a reasonable construction. *Wilt* would have been delayed and partly defeated, if, immediately

after the commencement of his suit, *Keely* had, with the consent of all his other creditors, executed a deed to trustees of the creditors' own choice, for the purpose of disposing of his estate, and dividing the proceeds equally among them. But I imagine no one would contend that in such case the conveyance was not good.

For the reasons which I have given, and many others which might be given, I conclude that the intent of *Keely*, so far as it appears by the verdict, was fair and lawful.

2. Let us next consider the *means* by which he carried his purpose into effect. He executed a conveyance of *all his property*, without specifying it, to a trustee of his own choosing; with power to the said trustee to convey part, or the whole of the said property to another trustee or trustees, under the control and direction of his creditors. *Keely* and his wife immediately acknowledged the deed before a judge of the court of common pleas of *Philadelphia* county. This was on *Saturday* night. On *Monday* following he confessed judgment to *Berthon* and *son*, who immediately took out a *fi. fa.* and levied on his goods, still remaining in his possession. On *Tuesday* night the deed was given by *Keely* to a messenger, to be carried next morning to *Bartholomew*, who lived twenty-three miles off; and on *Wednesday* it was delivered to *Bartholomew*, who then for the first time was made acquainted with it, and who consented to act as trustee.

By the *execution* of the deed, *Keely* irrevocably parted with all power over his estate. And it is to be remarked, that the transaction was not secret. The judge who took the acknowledgment must have been privy to the contents of the deed, because the law required him to make the contents known to Mrs. *Keely* when he took her acknowledgment.

As the counsel for the plaintiff relied a good deal on the case of *Burd* v. *Fitzsimmons* &c., decided in the high court of errors and appeals in this state, in support of some of their objections, under the head which I am now considering, I think it proper to mention that the *point, decided* there, is very little to the present purpose, because the two cases are essentially different. In that case a time was fixed, within which the creditors were required to give their assent to all the conditions of the deed. The shares, of those who did not express their assent, were to be paid over to Mr. *M'Clenachan*, the person

1809.

WILT
v.
FRANKLIN.

1809.

WILT

v.

FRANKLIN.

who made the conveyance, and who was notoriously insolvent; and there was reason to suppose that it would have been almost impossible for the whole of the creditors to receive notice of the deed, and signify their assent within the limited time. The authority of that case goes no farther than the *main point decided.* As to the reasons on which the different judges founded their opinions, they were various.

I will now consider the *particular* objections urged by the plaintiff's counsel in the case before us.

1. The trustee was chosen by the debtor himself.

Although it is most prudent and proper to consult the creditors, as to the choice of a trustee, when it can be done without great inconvenience, yet where there is no bankrupt law existing, (which is our present situation) I know of no law which forbids the debtor to make the choice himself. There is no occasion now to decide, whether, under certain circumstances, the choice made by the debtor would not be conclusive proof of fraud; as where the trustee should be an intimate friend or near relation of the debtor, desperate in his fortune, and of notoriously bad character. No imputation whatever is thrown on the trustee here; and it is of some weight that the deed contained an opening for a choice to be made by the creditors, which in fact afterwards took place. It is to be remarked too, that had *Keely* waited to consult his creditors after *Wilt* obtained his verdict, the judgment would have been entered, and the preference of *Wilt,* as to the real estate, been established. Under the bankrupt system in *England,* an attempt by an insolvent trader to throw the management of his affairs into the hands of a trustee of his own choice, is in direct violation of the whole spirit and system of the laws, and therefore amounts in itself to an act of *bankruptcy.* Many cases of that kind were cited; but they are inapplicable, being founded wholly on the *English* statute law.

2. As to the want of a *schedule.* It is very desirable that conveyances of property should be accompanied with schedules. They are a great convenience to creditors, and a check upon fraud in the debtor. But they are more necessary, where *part* of a man's property is conveyed to *particular* creditors, than where the *whole* is conveyed for the benefit of *all;* and I am satisfied that many conveyances of the latter description have been made *without schedules,* and proved very beneficial to the

creditors. The want of a schedule is a *circumstance* proper to
be taken into consideration; but I cannot think that it is, in it-
self, conclusive evidence of fraud.

3. The next objection is the nondelivery of possession; this
applies only to the *goods*. I agree, that in general, the conti-
nuance of possession in the grantor is one of the strongest
marks of fraud, especially if such possession continues a con-
siderable length of time. I agree too, that in many cases pos-
session has been adjudged to make a conveyance fraudulent,
where no *actual fraud*, no *criminal* intent, was supposed to ex-
ist. Although the statute 13 *Eliz.*, as I mentioned before, is
bottomed on the supposition of an immoral intention, yet it
has been judged necessary to determine, that certain circum-
stances, which, in their nature, tend to deceive and injure cre-
ditors, shall be considered as sufficient evidence of fraud. Such
was *Twyne's case*, (the leading case on *possession*) where the
creditor, to whom a general conveyance of the *debtor's whole
property* was made, in satisfaction of a just debt amounting to
more than the whole property, suffered the debtor to retain
the possession, to use the property as his own, to dispose of
what he pleased of it, and to put his *own mark* on the sheep.
There is no searching the heart of man; but a possession of
this kind tends so directly to deceive the world, that it was
fair to conclude, that the conveyance in *Twyne's case* was at-
tended with some secret trust for the benefit of the debtor.
Possession is not always in itself conclusive evidence of fraud,
but is open to explanation. In the case before us, the deed was
executed late on *Saturday* night. *Sunday* is not a day of busi-
ness. The trustee lived twenty three miles off. On *Monday* the
goods of the debtor were levied on by *Berthon* and *son*. Being
in custody of the law, the necessity of a delivery to the trustee
was less urgent. Indeed I do not see how a delivery could then
have been made. All that could be done, was to inform the
trustee what the goods were; and that they had been taken in
execution. Under these circumstances, I think the nondelivery
of possession is sufficiently accounted for.

4. The last objection, to the validity of the deed, is that no
money was paid by the grantee. I do not think this objection
can be supported. The bargainee undertakes to pay the whole
proceeds of the estate to the creditors of the bargainor, for his
benefit. But independent of that, as the objection is merely

1809.

WILT
v.
FRANKLIN.

technical, and applies only to the *form* of conveyance, it is answered by the opinion of *Anderson* Justice, in *Smith* v. *Lane*, 1 *Leon.* 170, and of the whole court in *Fisher* v. *Smith*, *Moor.* 569, that if a consideration of money is *expressed* in a deed of bargain and sale, there shall be no averment or evidence received to the contrary. I adopt this principle so far as to support the formal part of the conveyance; to go farther is not necessary.

Having thus considered the principal objections to the deed, my opinion on the whole is, that it is valid. It only remains to determine at what time it took effect; whether on its execution, or on the *Wednesday* following, when the assent of the grantee was expressly given.

This does not appear to me to be a point of much difficulty. The plaintiff's counsel concede, that where the deed is for the *benefit* of the *grantee*, it is reasonable that his assent should be *presumed*. They were right in this concession. I think it reasonable to make the same presumption, where the grantee is required by the deed to do an act useful to his neighbour, and not injurious to himself. This presumption is liable to be rebutted by shewing an express dissent. A man cannot be forced to accept a conveyance against his will. But, in the present instance, the presumption is confirmed by the assent of the grantee, the moment he was informed of the conveyance. I am therefore of opinion that it took effect from the execution on *Saturday* night; of course it is not subject to the lien of the judgment of the plaintiff *Wilt*.

Upon the whole of the special verdict, my opinion is in favour of the defendant.

YEATES J. If the assignment made by *Matthias Keely* to *John Bartholomew*, in trust for all his creditors, " in just and " equal proportions according to their respective demands, " without any preference or advantage to one more than " another," can be sustained at law, to take effect from its date, the necessary consequence will be, that judgment must be entered for the defendant; because the assignment is prior in point of date to the judgments under which the plaintiffs severally claim. But the assignment is attempted to be impeached on several grounds, which I shall separately consider.

1. It has been objected, that there is no good consideration

to give validity to the assignment, the jury having found that no money was paid by the trustee to *Keely*. The instrument recites that " *Keely* owed and was justly indebted unto divers persons " in divers sums of money, but, being incapable to pay off and " discharge the same to their full amount, was nevertheless de- " sirous, so far as lay in his power, that they should be satisfied " in just and rateable proportions, according to their respective " demands;" and that in consideration as well of the premises, as of *7s. 6d.* in hand paid by the said J. B. the receipt whereof was thereby acknowledged, did grant, &c. In reason and sound sense, money, honestly due from the party assigning, is equivalent to money paid down; and we have lord *Hardwicke's* authority that it is a good consideration. (*a*) Other judges have adopted the same doctrine, and have said (*b*) " that in deciding " questions of this kind, the courts have always disavowed in- " quiring, whether or not the consideration be equivalent; they " will not weigh it in very nice scales, if it be an honest trans- " action." Very small considerations have been holden sufficient to give validity to a deed. Besides, the assignment expressed that *7s. 6d.* was paid by the trustee. This is sufficient to raise an use under the statute; and though it is inserted in the special verdict, that no money was paid, it is clearly settled, (*c*) that there can be no averment against the consideration contained in a deed, so as to affect its binding force; and consequently it is not susceptible of proof.

2. It has been urged that the assignment took no effect until the 7th *March*, when *Bartholomew* assented thereto, and therefore the judgments, entered on the 5th *March*, have their full operation. To this it is answered, that the assent, of the party that takes, is implied in all conveyances, by intendment of law, till the contrary appears; and that this is as strong as the expression of the party. *Stabit praesumptio donec probetur in contrarium.* (*d*) This doctrine has been asserted by *Ventris* Justice, in his elaborate argument in the much disputed case of *Thompson* v. *Leach*, (*e*) which commenced in the common pleas, was afterwards carried by writ of error into the king's bench, (*f*) and was finally determined in the house of lords, upon the reasons contained in the argument of *Ventris;* so that his opinion

1809.

WILT
*v.*
FRANKLIN.

(*a*) 1 *Atk.* 463, 4.
(*b*) 8 *T. R.* 529.
(*c*) *Dyer.* 90. *Shep. Touch.* 222, 3.
(*d*) 2 *Ventr.* 202.
(*e*) 2 *Ventr.* 198. 1 *Show.* 296. 3 *Lev* 284.
(*f*) 3 *Mod.* 296.

1809.
WILT
v.
FRANKLIN.

finally prevailed. (a) In *Meux and others qui tam* v. *Howell and Atlee.* (b) *Lawrence* J. asks the plaintiffs' counsel these questions during their argument: " May not a person indebted " to several, without the imputation of fraud, confess a judg- " ment to a trustee, to enable him to take all his property for " the benefit of all his creditors equally? Does not a court of " equity act upon the same principle, in the distribution of " assets? And why should there be a previous consent of the " *cestui que trusts,* if they consent afterwards?" The fact more-over is, that here was an acceptance of the trust, in a reason-able time after it was created. The trustee lived twenty three miles from *Keely.* The assignment was executed on *Saturday* night of the 3d *March,* at 10 o'clock. On *Monday* the 5th, the goods and furniture were levied on by the sheriff at the suit of *Peter Berthon* and *son.* On *Wednesday* the 7th, *Bartholomew* accepted the trust; and on the 10th, pursuant to a provision contained in the deed, he assigned the same to *Thomas Allibone* and *Caleb North,* who had been elected by the creditors. On le-gal principles therefore, the acceptance will refer back to the execution of the deed, and form one transaction, done at the same time.

3. It is objected that *Bartholomew* was no creditor, nor elected by the creditors in general to take the assignment. I do not see how his not being a creditor can detract from the validity of the instrument. If, indeed, the assignee had been insolvent, or was incompetent to the execution of the trust, it would afford strong evidence of meditated fraud; but neither of these facts is found by the special verdict; and they cannot be presumed. Besides, this assignment contained a proviso, that *Bartholomew* should " grant and assign the premises, or " any part thereof with the appurtenances, to one or more " trustees, under the control and direction of the creditors." And it is found by the special verdict, that in pursuance thereof, the said *John Bartholomew* assigned the premises to *Thomas Allibone* and *Caleb North,* on the 10th *March* follow-ing, who had been authorized by a meeting of the creditors to take the said assignment. This brings the case within the law maxim, *omnis ratihabitio retro trahitur et mandato æquipa-ratur.*

(a) 2 *Ventr.* 208. 1 *Show. Par. Ca.* 150.        (b) 4 *East* 9.

4. It has been insisted that no time has been limited, within which the execution of the trust should be completed. The words of the assignment, as to this point, are, " that the " trustee shall forthwith take possession and seisin of the " premises, and within such convenient time, as to him shall " seem meet, by public or private sale, for the best price that " can be procured, convert all and singular the estate, real, " personal, and mixed into money; and shall, *as soon as possi-* " *ble,* collect all and singular the debts and sums of money " above assigned, and, after deducting the costs and charges " of the trust, shall pay and apply all the moneys arising " therefrom," &c. The force of the objection is greatly taken off, by the provisions of the act of 22d *January* 1774. (*a*) The commissioners appointed by the courts of common pleas, have sufficient powers to oblige the trustees and assignees of insolvent debtors to execute their trusts, and can prevent all unreasonable delays. Where the estate of a person, who has failed in trade, is scattered and dispersed in different places, it is next to an impossibility to fix a period of time, within which all his accounts can reasonably be expected to be adjusted; and in the cases of debtors discharged under the insolvent acts, no period is ever fixed, within which the assignees shall close their trusts.

5. It has been further insisted, that the goods of *Keely,* and his real estate with the title deeds, did not pass into the hands of the assignee; and that the debtor's continuance in possession is a mark of trust if not of fraud. I agree the general rule to be, that in the transfer of chattels, (*b*) unless possession *accompanies and follows* an absolute deed, it is fraudulent and void as to creditors; and that the vendor's continuing in possession is inconsistent with such deed. Yet there are cases where, though possession was not delivered at the time, the conveyance was not held to be fraudulent. To form a correct judgment on this head, we must distinctly mark the different events, as they occurred in order of time. On the 3d *March,* the assignment was executed and acknowledged between 9 and 10 o'clock at night, *Bartholomew* not being present. This was on *Saturday.* The goods and furniture of *Keely* remained in his possession the residue of that night,

1809.

WILT
*v.*
FRANKLIN.

(*a*) 1 *St. Laws* 690.     (*b*) 2 *T. R.* 594. 2 *Bro. Cha. Ca.* 650.

1809.

WILT

v.

FRANKLIN.

and until *Monday* morning, when the sheriff levied on them at the suit of *Peter Berthon and son.* On *Tuesday* the 6th, the assignment was sent on to *Bartholomew,* who accepted it on the next day; and on the same day *Keely* was imprisoned for debt. On the 10th *March, Bartholomew* assigned to *North* and *Allibone,* in pursuance of the requisition of the general creditors. An execution in the house would prevent the assignee from taking possession of any part of the property on *Monday;* and it would be straining matters very hard to suppose that *Keely* obtained any false credit by the goods and furniture continuing in the house as usual, the small remnant of *Saturday,* and the whole of *Sunday.* It is not found that he either bought or sold, or in any manner dealed during that interval; nor that the title deeds of his real estate were fraudulently withheld from his assignee. It has been resolved, that not taking possession is only evidence of fraud, (*a*) and, like other equivocal facts, may be explained by circumstances. As to the title deeds being retained by *Keely,* this circumstance would not have the same effect here, as possibly it might in *England,* where they have no general statute for the registry of deeds; and it has been determined at nisi prius at *Reading* in *May* 1792, between *Evans, executor of Evans,* v. *Jones & ux. administrator of Nicholas,* that it was not necessary that mortgagees should have possession of the title papers.

6. Lastly, it has been objected, that no schedule accompanied the assignment. Much stress has been placed on the decision of the case of *Burd,* plaintiff in error, v. *Fitzsimmons et al.* in the high court of errors and appeals. (*b*) As I understand that case, the majority of the judges determined the assignment of Mr. *M'Clenachan* to be invalid on several grounds, but chiefly, as I apprehend, on this, that under the terms of the deed, a trust resulted to the debtor himself, for the proportions of all such creditors, as should not agree in writing to accept thereof, within the period of nine months from the date. The creditors were widely dispersed, many of them were beyond sea, and the assignees were not provided with the means of executing the trust reposed in them. It is true, two of my brothers were of opinion, that there should have been a schedule annexed, designating the creditors, or explanatory of the debts and property. But with all due deference, I would ob-

(*a*) 1 *Burr.* 484.          (*b*) 4 *Dall.* 76.

serve, that I can find no positive rule of law, or commercial usage, which imperiously demands a schedule of creditors or debtors, to confer validity on a general assignment. I can find no such precedent in the books, nor have any such occurred to me while at the bar or on the bench. I admit, that such a list may contribute to facilitate the labours of the assignees; but the question now is, whether it be essentially necessary. If the books of the debtor have been well kept, they would afford much better sources of information, than any schedule; if ill kept, no man of extensive dealings can possibly know the true state of his accounts with individuals. In most cases the demands of creditors on the spot can be ascertained by convening them together.

It cannot be denied, that this assignment was made for the express purpose of preventing a preference to the plaintiffs in these suits; or, in other phrase, of putting the creditors in general on one common footing, without any kind of priority. That this was an immoral act, will not be asserted. Was it then illegal, and prohibited by the words and spirit of the *stat.* 13 *Eliz. c.* 5.?

That act, as well as the *stat.* 27 *Eliz. c.* 4. is in affirmance of the common law, whose principles and rules, as they are now universally known and understood, would, according to lord *Mansfield,* (a) have attained every end proposed by those statutes. The question in every case is, whether the act done is a *bona fide* transaction; or whether it is a trick and contrivance to defeat creditors. The plaintiff's counsel have urged that this assignment was made, " to the end, purpose, and intent to de-" lay, hinder, or defraud creditors and others of their just and " lawful actions," &c. But lord C. J. *Ellenborough* has declar-ed in *Meux, qui tam,* v. *Howell,* " that it is not every feoffment, " judgment, &c. which will have the effect of delaying, or hin-" dering creditors of their debts, that is therefore fraudulent " within the statute. For such is the effect *pro tanto* of every " assignment, that can be made by one who has creditors. " Every assignment of a man's property, however good and " honest the consideration, must diminish the fund out of which " satisfaction is to be made to his creditors. But the feoffment, " judgment, &c. must be devised of malice, fraud, or the like, " to bring it within the statute." Were there then, in the words

*(a) Cowp.* 434.

1809.

WILT
v.
FRANKLIN.

1809.

WILT

v.

FRANKLIN.

of the statute, " malice, fraud, covin, collusion, or guile," in the present instance, " to the intent to delay, hinder, or defraud " creditors, not only to the let or hindrance of the due course " and execution of law and justice, but also to the overthrow " of all true and plain dealing?" The trust is in express words, " for the use of all the creditors, in just and equal proportions, " according to their respective demands, without any preference " or advantage to one more than another." In every civilized country in *Europe*, it has been anxiously attempted to effect an equal distribution of the property of insolvent persons. In *Great Britain*, it is said by lord *Mansfield*, (a) that the whole bankrupt law has two main objects in view, to wit, the management of the bankrupt's estate, and an equal distribution among his creditors. Such was the spirit of the system of bankruptcy of the *United States*, under their act of *April* 1800; and such was the spirit of the laws of this state, passed anterior to the adoption of the constitution of the *United States*. I cannot bring myself to believe, that a conformity to such laws can be denominated either an actual or legal fraud, and shall conclude with the strong expressions of *Grose* J., in *Meux* v. *Howell*, before cited: " Here there is nothing like a fraud; and it " makes one shudder to think, that persons, who appear, like " the defendant, to have acted most honestly, should have been " in any hazard of being subjected to punishment, for having, " endeavoured to procure an equal distribution of his property " amongst all his creditors."

My opinion is, that judgment should be entered for the defendant, in both suits.

BRACKENRIDGE J. The first thing that strikes me in this case, is, that it was not until the last moment, that the debtor thought of making an arrangement for the distribution of his property, with a view to a *pro rata* payment of his debts. It was not until after a verdict on which judgment was about to be entered, and execution to issue. It may be said that the verdict was unexpected, and that there may have been a defence in fact, to the action, though he had not been able to make it out. But we find that he confesses judgment in another case, to which he had set up a defence, and which lessens the presumption that he honestly thought in this case

(a) 1 *Burr*. 476.

that he had a defence; for it proves that he was not incapable of contesting, or at least delaying the payment of a just debt. Now, if the only motive had been the payment of his debts, it would have looked better to have begun sooner. As the case is, it has the appearance of being driven to it, and a suspicion arises of a contrivance to save something for himself.

The second thing that strikes me, is, that the trustee selected is not an indifferent person; but one who acknowledged in the words of the case stated, " that he was a friend of the family, and was willing to oblige him (the debtor) in this respect; that he was very willing to serve, but that his illness would prevent him from coming to the city." Was there no creditor at hand, who could have been consulted in the constituting a trustee? Or was there no indifferent person who could have been prevailed upon to be made a trustee? One near at hand, into whose possession the property could have been delivered for the use of the creditors. As the case is, there is no substantial difference from the debtor being his own trustee, and having it in his power to do what he pleased with the property.

It is to be remarked, that the creditors are in the power of the debtor, with respect to the debts due; and might he not say to a particular creditor, how much do I owe thee? 500 dollars. Take thy bill and write down 1000 dollars. Is there no danger of such *unjust stewardship*, where a person is about to be insolvent; and where the liquidation of the debts, is with a trustee of his own nomination?

The third thing that strikes me is, the not delivering a schedule or list of the property, which is the next thing to the delivering possession of the property itself; and which might be done, where the property itself could not be delivered; books, papers, &c. An inventory of the property is the next best thing to the possession of the property itself. If the debtor had made a sale directly to any one, for a valuable consideration, would he not be likely to give possession? Would it not be a badge of fraud if he did not? Where that could not be done, would we not expect that he would come as near it as possible, by delivering an inventory of the property transferred? Where the possession is not changed, the property remains in the power of the debtor, and may be disposed of by him. But an inventory may be a check upon the embezzlement.

VOL. I.                    3 X

1809.

WILT
v.
FRANKLIN.

1809.

WILT
v.
FRANKLIN.

I do not say that because every thing was not done, that might have been done, the assignment is void; but the leaving any thing undone, is so far a defect in excluding the presumption, that the debtor has consulted his own interest in making the arrangement; because he has not put it out of his power to have an interest, from an understanding with the trustee, or particular creditors.

It will be said the exigency was pressing in this case; and that it ought to be a sufficient answer, that the time did not serve to call the creditors together, and make an assignment, and deliver the property to them; or to get a trustee of their nomination, and to deliver the property to him for their use; or to make out a schedule of debts and credits, or an inventory of the effects, and to deliver this to the creditors or trustee: that it was impracticable before the judgment would have been a lien, and the execution attached, and the estate taken by particular creditors: that equality is equity: that it was the part of an honest debtor to endeavour to provide for a *pro rata* distribution of his property; and that having done all that could be done, in the short space of time he had to act, it ought to be supported. But I think it of equal, or of more importance, that no opportunity be given to a debtor to arrange for himself at the expense of his creditors; and which opportunity he will have, if such a disposition can be supported. We shall have instances enough of this kind of *last will and testament of a debtor* about to be insolvent. If it is meant to provide for the payment of debts honestly, and to let the whole go to that purpose, why begin so late? Why not sooner look out, and make distribution? Insolvency in itself *carries with it the presumption of dishonesty;* for it is oftener the result of *imprudence*, than of misfortune; and I cannot call the man who makes use of the property of others, even imprudently, a perfectly honest man; and the man, who runs in debt, makes use of the property of others. The scripture tells us, that " he who maketh haste to be rich, shall not be innocent;" and it is usually such as make haste to be rich, that run in debt, and become insolvent. I believe I might say, with great safety, that they are seldom innocent. The law treats the man who is about to take the benefit of the insolvent act, as a person somewhat to be suspected; he is examined on oath, and undergoes a purgation. We lay hold of his conscience, and superadd the fear of a prosecution for per-

jury, to the sense of moral obligation. We are far from leaving the disclosure to a simple declaration. The presumption is, that it is his purpose to defraud; and hence notice to creditors, and the privilege of crossexamining in open court, in order to satisfy all concerned with respect to the fairness of the surrender, and account of property.

Where the debtor undertakes to make an equal provision for the payment of his debts, and professes good motives, he presents himself with a better appearance somewhat; nevertheless, we are justified in distrusting his motives.

I think it reasonable to require of him every thing that will rebut the presumption of an interest for himself.

It may be, that the oldest creditor has not sued first, or first recovered judgment. But the presumption is, that the patience of the oldest creditor has been first exhausted, and that he has sued first; and on the principles of natural justice, the oldest debt should be first paid, The law cannot carry the administration of justice to such extent, as to take notice of the oldest debt. It could not be conveniently practicable. But it will take notice of the suit first instituted; and the maxim will apply, *prior in tempore potior in jure.* In cases where the order of paying debts is left to the law, it will give a preference to a judgment; and between judgments themselves, it will respect the priority. Here the debtor has undertaken to cut out judgments, and to put them on a footing with other debts. It is true, he may have thought some of them of more meritorious consideration; but with me the more natural presumption is, that he was irritated at the process that had been instituted, and the recovery against him; and that, for that reason, he wished to defeat the recovery, and give it no other advantage than other creditors had; which I think unfair, having put them to the expense and delay of legal proceedings. And though the conclusion may not be inevitable, that he was combining an interest for himself, or that it was the dominant and ruling motive, yet I cannot see but that he had it in his power to conceal, and save property for his own use, where the trustee was of his own nomination, and where a number of the creditors were rendered favourable by the race made to get ahead of the judgment and the execution, and to put them all on a footing.

It has been said, that fraud is not to be presumed; it must be proved. But this is proving it by circumstantial evidence. Fraud, in most cases, is but a conclusion from circumstances; and circumstances are but presumptive proof; and therefore it is not the meaning of the maxim, that presumption shall not arise from circumstances.

But it has been argued also, that fraud not being found by the jury, the presumption cannot be weighed and the conclusion drawn by the court. But on a special verdict the conclusion must be drawn by the court; for it is the nature of the special verdict, that it be left to the court to infer from the facts what the jury might have done had they taken upon themselves to infer, and give a general verdict, which contains the conclusion of fact from the evidence, and the conclusion of law from the fact. The jury, in this case, have found the facts from the evidence; and, as in the case of every other special verdict, it remains with the court to draw the conclusion of fraud, whether it be a conclusion of fact, or of law. Doubtless the conclusion of fact must be in the minds of the court, before they can draw the conclusion of law.

Under the circumstances of this case, if I am to draw the conclusion, it will be, that the debtor had an interest in the arrangement; but, even supposing that he had not, the disposition in the hands of a trustee of his own nomination, and the property remaining with himself for a time, and no inventory of the effects in the hands of a creditor, leave it in his power to make use of the property after the assignment, and before it comes to the hands of the trustee; and, for this reason, I must think such disposition against good policy, and not to be supported. I think it better, that a judgment creditor should take the whole, or the greater part, of a debtor's property, than that a door to fraud should be opened by sanctioning such a disposition. The truth is, I do not much like the idea of cutting out the judgment creditor, and taking the disposition out of the hands of the law, when it is just about to take the property. A sense of wrong arises in my mind. I think it unfair; the heart revolts; and the only difficulty with me is, to analyse and give good reasons for feelings which I think must be just.

But it is not necessary, in this case, to draw the conclusion of fraudulent intention, or of legal fraud, so as to avoid

the deed: that is, to render it absolutely void as between the parties. It will be sufficient if it can be avoided, or rendered voidable, with regard to those who do not become parties; and the operation restrained in the case before us, short of affecting the lien of the execution. I will admit that a debt is a valuable consideration, and will support a conveyance as much as money paid at the time of the conveyance; for it must be considered as a consideration past. But the law will not presume an acceptance by the creditor, as in the case of money paid, or where the grant is a gift. Because it does not necessarily follow, that it will be for the benefit of the creditor, or that he would think it for his benefit; and it is upon this ground alone, that the law will presume a subsequent assent. This may be collected, in particular, from the argument 2 *Ventris* 198. where the case was a grant on a consideration good, not valuable, and the estate a gift. But it does not follow, with moral certainty, that a creditor will take property for his debt, or wait the sale of property, under the management of a trustee not of his own nomination. Money is what he had a right to expect; and it may be, that he will insist upon money paid immediately, or to be collected by the process of the law. Even taking it for granted, that the debtor is about to be insolvent, and unable to discharge the whole of his demands against him, it does not necessarily follow that he will take property, or wait the sale of it; for the debt is still recoverable from the future effects. But where the property conveyed is not supposed to be an equivalent, or will not satisfy the debt of every creditor, and a *pro rata* payment only can be contemplated, it is not an intendment of law that the creditor will accept. It may be very probable that he will accept; but it cannot be legally inferred. The law will not imply it, as in a case where *the grant cannot but be for his benefit*. But supposing a presumption of law to arise that the creditors, other than the judgment creditors, will accept, there can be no presumption that the judgment creditors will accept, who have it in their power to take the property immediately under executions. For these reasons, the subsequent assent of the creditors, expressly given, will be necessary to complete the transfer in this case; and the assignment can have no operation until that assent is given.

But let it be supposed that in the case of a conveyance immediately to the creditors, an assent to take may be presumed,

1809.

WILT
v.
FRANKLIN.

the assignment is not immediately to the creditors; a medium is used; a trustee; and there is no consideration of the trust to the trustee himself. It is not accompanied with any benefit to him; for any benefit that is pretended *is that of the debtor.* There is no presumption of law that he will undertake the trust. It is on this ground that the principle must rest, that where the trustee has no benefit, it is not to be taken for granted that he will accept. The law to this effect is suggested in a late publication, *Roberts on Fraudulent Conveyances,* 430. " A general convey-
" ance or assignment to a stranger, in trust to pay the debts of
" the person conveying, is clearly not a consideration sufficient
" even to raise a use upon a covenant to stand seised. Nor will
" it suffice to support an actionable promise; for in such case no
" consideration moved from the promisee of advantage to the
" party promising." It is clear, therefore, that the assent of the trustee is necessary to undertake the trust, before he becomes a trustee, and an interest can vest for the *cestui que trust.* Until that is done, there is no conductor of the interest; it remains with the owner of the property. *Non constat* that the trustee named will undertake the trust. Although there is an act of assembly, 1 *St. L.* 690., which provides for the calling trustees to account, yet it makes no provision for the compelling any one to be a trustee. It cannot therefore be taken for granted that a trust exists; and that a delivery to one of the deed of assignment to be delivered to the trustee, renders the delivery complete for the use of the creditors. The property remains in the debtor, and is liable to be taken for his debts, unless by relation the subsequent assent of the trustee can be coupled with the assignment in the first instance, so as to operate from the date. This, as between the parties who subsequently assent, there can be no doubt, will be the effect; for it is consonant to justice, and to reason, that it should be so. It is a matter between themselves; and the inchoate, or inceptive, and concluding act make but one. It is all the same transaction. It is in support of the intention of the parties, that the instrument should operate from the date. But relation is a fiction; and, *in fictione juris semper subsistit equitas.* Relation shall do no wrong to strangers. 2 *Ventris* 119. There are many authorities in the books to this effect. But if there were not, it is such a principle of reason and common sense, that it could not be doubted. If at the date of the conveyance the property is not absolutely out of

the debtor, but the operation suspended until the subsequent
agreement of him who is to take, that suspension cannot inter-
cept the act of the law which attaches the property. I therefore
take it, that the assignment in this case did not take place of
the execution.

*1809.*

*WILT*
*v.*
*FRANKLIN.*

Judgment for defendant.