1811.

Binney.
3b 557
130 569

Lancaster,
Saturday,
May 25.

3b 557
183 484

JANE WILSON *against* JOHN WILSON.

THIS was an appeal from the judgment of the late Mr. Justice *Smith* at a Circuit Court for *Lancaster* in *May* 1808.

It was an action for *money had and received*, brought by the plaintiff, who was the widow of *John Wilson* deceased, to recover from the defendant who was his executor, her distributive share of so much of the testator's personal property as was not disposed of by his will. The writ and the recital in the declaration were against the defendant *as executor;* the count was against him personally, as upon a promise in his individual character. Pleas *non assumpsit, and payment.*

Upon the trial of the cause the material evidence was this. *John Wilson* the testator, on the 31st of *August* 1789 made his last will and testament, in which, after ordering that all his just debts and funeral expenses should be fully paid out of his personal estate, he gave to the defendant, who was his son, the plantation on which he then lived, together with all his mountain and timber land in *Chester* county, in fee simple. He gave to his daughter *Mary* 400*l.*, to his daughter *Margaret* 400*l.*, to his grandson *John Hamilton* 100*l.*, to his grandson *John Teters* 50*l.*, to his son-in-law *Samuel Bigart* 10*l.* without any deduction, and to his granddaughters *Sarah* and *Margaret Bigart* 50*l.* each. He further ordered that his well beloved wife *Jane Wilson* should have the profits of the place he lived on during her natural life, and after her death that it should fall into the hands of his son *John*. He then directed that " the land where *Robert Knox* " now lives on in *Leacock* township, together with fifty acres " of timber land lying in *Lampeter* township, be sold after my " decease, and 100*l.* of the purchase money be paid to my " daughter *Margaret Hamilton*, and the interest of 100*l.* " to be paid to my daughter *Mary Teters*, and at her de- " cease the said 100*l.* to be divided equally between her " children. And lastly, I do appoint and constitute my be- " loved son *John Wilson*, and my son-in-law *Robert Hamil-*

An executor in the state of *Pennsylvania* has always been a trustee for the next of kin, as to all the personal property of the testator not disposed of by his will.

An action for money had and received will lie against an executor in his personal character to recover a distributive portion of the testator's estate not disposed of by his will, and which has come to the executor's hands as trustee.

" *ton* to be my executors to this my last will and testament, " and I do hereby disannul all former will or wills, and con- " stituting this and this only to be my last will and testa- " ment."

*Robert Hamilton* renounced; and on the 1st *February* 1802 the defendant settled his account in the register's office, by which, after paying debts and legacies and a commission which he charged for his services, a balance of personal estate was found due of 2369*l.* 17*s.* 4*d.*

The plaintiff obtained a verdict for 621*l.* 3*s.* 3*d.*, which Judge *Smith* refused to set aside; and it was from this decision that the defendant appealed.

The case was first argued at *March* term 1809, by *Montgomery* and *Tilghman* for the plaintiff, and by *Hopkins* for the defendant, who made two points. 1. That an action for money had and received would not lie against the defendant in his own right, but that it should have been a special action on the case against him as executor. 2. That the defendant took the surplus personal estate of the testator not disposed of by his will, beneficially, and not as trustee for the next of kin.

The *second* point was again argued at *May* term 1810, by *Hopkins* for the defendant, and by *Bowie* for the plaintiff; and having been held under advisement until this day, the judges now delivered their opinions.*

TILGHMAN C. J. This is an action on the case for money had and received, brought by the widow of *John Wilson* senior, against the executor of her husband's will, to recover her share of her husband's personal estate. The defendant makes two objections to the plaintiff's recovery. 1. That an action for money had and received does not lie in this case. 2. That all that part of the testator's personal estate, not disposed of by the will, is vested in his executor for his own use.

1. The first objection is founded on the impropriety of making the executor personally responsible for property which came to his hands *as executor*, and cases were cited to

* See *Grasser* y. *Eckart,* 1 *Binn.* 575.

shew, that in *England* an action for a legacy will not lie against an executor, unless he has made an express promise to pay it. But these cases establish no principle sufficient to bar the plaintiff's action. The courts of *common law* in *England*, have no jurisdiction in cases of legacy, and therefore nothing less than an express promise will support an action. But in this state, where we have neither ecclesiastical courts, nor a court of chancery, the case is different. We have recourse to the courts of common law from necessity. For although the Orphan's court may inforce their decrees by attachment, yet that is but an imperfect remedy. These considerations induced the legislature of *Pennsylvania* long ago, to pass an act for the recovery of legacies in the common law courts; and the courts have thought themselves justified in supporting an action in a case like the present, which is not a demand for a legacy, but for the share which belongs to the wife on a *partial intestacy* of her husband. The action for money had and received being very convenient in its form, has been encouraged by our courts. It is well adapted to a case like the present. The plaintiff does not claim by virtue of any demand which she ever had against the *testator;* there is no occasion therefore, that her judgment should be against the goods of the testator. Although the personal estate came originally to the hands of the defendant *as executor*, yet the money which remains after the payment of debts &c. may not improperly be considered as received by him for the use of those persons to whom by law it belongs. Their claim against him is *in his own right*, for withholding the money which he unjustly detains. I am of opinion therefore that the form of action is proper.

2. The second point would have been of very great moment, if an act of assembly had not been passed, by which *in future* an executor is declared to be a trustee for the next of kin. It is the law *before* the making of that act, which we are now to decide. The principles by which the personal estate of deceased persons is disposed of, were settled at a period when personal property was generally of small amount. In *England*, in case of intestacy the ordinary took it into his possession, not for the purpose of paying the intestate's debts, and distributing the residue among his kin, but to dispose of

in *pious uses* for the *good of his soul.* This mistaken piety, which trampled on the first principles of justice, was at length seen in its true light; and by the statute 31 *Ed.* 3. *ch.* 11, the ordinary was directed to depute the next and most lawful friends of the deceased, to administer his goods, to collect the debts due to him, to pay those which he owed, and be accountable for the rest, in the same manner as executors in case of testaments. At the same early period it was established, that an executor by virtue of his appointment became intitled to all that part of the personal estate not given away by the testator. No good reason has been assigned for this. The business of an executor is to perform the will of the testator. It is so understood by most people who make wills, nor have they any idea of the unnatural inference, that what is not expressly given to other persons, is supposed to be given to the executor. The *English* courts of justice have long felt the injustice of the principle, and struggled to evade it. It was decided by the chancellor, in the case of *Foster* v. *Munt*, 1 *Vern.* 473, that the testator having given a legacy of 10*l.* a-piece to his executors for their care, they should be considered as trustees for the next of kin, as to that part of the estate which was undisposed of by the will. This decision was so much in unison with the feelings and understanding of the nation, that it has never been questioned; and it is material, that the settlement of *Pennsylvania* took place about the time that the law was thus modified in *England.* By the *English* law an executor has no compensation for his trouble, unless it is given to him by the will; but among us, as far back as the testamentary law can be traced, he has had a compensation. This was putting the matter on its proper footing. The executor was considered as a person appointed to execute the will of the testator, for which he was to receive a reasonable compensation. The inference is strong, that it was not intended he should take any part of the estate, which was not expressly given to him by the will. There are many instances in which the common law of *England* has not been received in this country, although it was not taken away by act of assembly. The land of deceased persons is applied to payment of debts in exclusion of the widow's dower. Married women have always been allowed to transfer their

right to land, without fine or recovery. It is unnecessary to mention other instances. Since the case of *Foster* v. *Munt*, it has been taken for granted in *England*, that if the testator gives a *legacy* to the executor, he does not intend that the executor shall take the residue for his own use. Then why should it not be taken for granted *here*, that it cannot be intended the executor should take for his own use, when every testator knows, that the executor is intitled by *law* to a compensation for his trouble? I am satisfied that it has been so taken for granted; that such has been the general understanding and practice. This point has never been decided by the Supreme Court. I understand, that about the time of the revolution, it was brought forward in the court of Common Pleas, but went off in the confusion of the war, or for some other cause not known. I know that it has occasioned some diversity of opinion. But when I say, that I believe the general understanding and practice to have been in favour of the next of kin, I rely not only on information received from the living, and from some of the dead, whose experience was carried back to early times, but upon the usage of the Register and Orphans' courts appearing on their records, where it will be seen that in all settlements (not excepting even the estate now in question) a commission is allowed the executor for his care and trouble. Now if he was intitled to the surplus, there would be an impropriety in allowing him a commission, because it would be only taking it out of his own pocket.

But *Boudinot* v. *Bradford*, 2 *Dall.* 268, has been cited to the contrary. The words are these. " But, *by the court*, " there is no such distinction (meaning a distinction be- ." tween the law of *England* and of this state) to be found " in any act of assembly, or judicial determination. The " next of kin are *only* intitled to personal estate in the " case of intestacy, and a man cannot be intestate, who has " made an executor." This report is certainly inaccurate in more respects than one. The *dictum* was not by the *court*, but by the *Chief Justice only;* nor did the other judges express any opinion, or consider the point alluded to as having been decided. This has been several times declared by the late judge *Smith*, both in private, and in his seat on the bench; and I know that his notes make no mention of any such de-.

1811.

WILSON
*v.*
WILSON.

cision. The opinion of Chief Justice *M'Kean*, I shall always consider as very respectable, but not to be compared to a decision of the court. There must be a mistake however, as to his having said that the next of kin could *only* take in case of an intestacy; for he well knew, that where a *legacy* is given to the executor, he is considered as a trustee for the benefit of the next of kin.

I have endeavoured to ascertain the opinion and practice of the courts in our sister states, but have not been able to procure such satisfactory information as I expected. In *Maryland*, the executor has always received a commission founded on act of assembly, and always been considered as a trustee for the next of kin, although there was no act of assembly to that purpose. In *Virginia* the law has been received as in *England*, until altered by act of assembly. At present the executor is a trustee for the next of kin.

Where a rule of property has been settled, I shall never think myself at liberty to alter it, even though I should suppose that it had been founded on a mistaken principle. But considering the point before us as completely open, I must declare my opinion, that in consequence of the acts of assembly allowing a commission to executors, the common law of *England* has in this respect never been received in *Pennsylvania*, and the executor must be considered as a trustee for the next of kin.

YEATES J. It is the settled rule in *England*, that the naming of executors is by implication a gift to them in law of all the goods, chattels, credits and personal estate of the testator. *Wentw. Off. of Exrs.* 4. 5., *Toller* 275., *Roper on Legacies* 219. It lays on them an obligation to pay his debts, and makes them subject to every man's action for the same. In *Newstead* v. *Johnston*, 2 *Atk.* 46., more fully reported in 2 *Burn's Ecc. Law* 168. 4th ed. Lord *Hardwicke* says, as the law stands now, where a person appoints one executor, it is giving him the residue, unless there is a particular legacy. And the same rule holds in the ecclesiastical courts. The judicious Mr. *Coxe*, in his note on 1 *Pr. Wms.* 550., and *Fonblanque* in his notes on the *Treatise of Equity, vol.* 2. *p.* 131., lay down the law in the same manner, and each

of them has collected the result of the many cases on this subject. Having stated the rule of law, they proceed to say, that if in equity it can be collected from any circumstance or expression in the will, that the testator intended his executor only the office and not the beneficial interest, such intention shall receive effect, and the executor shall be deemed a trustee for those on whom the law would have cast the surplus, in case of a complete intestacy. *Equal* pecuniary legacies will exclude executors from taking the surplus; 1 *Vern.* 473., 2 *Vern.* 676., *Pre. Cha.* 81., 3 *Pr. Wms.* 194. *note*, 1 *Pr. Wms.* 544., 2 *Pr. Wms.* 162., 2 *Vesey* 162.; but wherever the legacy is *consistent* with the intent that the executor should take the whole, a court of equity will not disturb his legal right; as in the case of a legacy to one only of two or more executors, neither shall be excluded from taking the surplus, because the testator might intend to such a one a preference *pro tanto. Prec. Cha.* 323., 4 *Bro. Parl. Ca.* 1., 2 *Ves.* 167. 166. 91. And so where several executors have *unequal* legacies, whether pecuniary or specific, they shall not thereby be excluded from the residue. 2 *Atk.* 68., 2 *Ves.* 27. The rule is universal, that wherever the legacy to the executor is consistent with the intent that the executor should take the undisposed residuum, chancery will give him no obstruction. *Toller's Law of Exrs. and Admrs.* 277., 7 *Bro. Parl. Cas.* 1., 2 *Burn's Ecc. Law* 172. The different determinations cannot be reconciled in principle to each other. This must be resolved into the different inclinations of the chancellors to favour, some the legal, others the equitable rule, and endeavouring to make the favoured rule apply to the case before them. 1 *Wash.* 65. We are told, 1 *Stra.* 569., that lord chancellor *King* brought a bill into the house of peers, which passed that house, to settle the *vexata quæstio;* but upon sending it down to the commons, it was thrown out upon the first reading, a bill sent up by the commons to prevent bribery and corruption in elections, having been refused to pass in the house of lords. The bill was to have settled it for the benefit of the executor.

It has been questioned, whether the law of *England* in this particular is applicable to *Pennsylvania*, or has been acted on as such. By the fifth section of the royal charter, 1

1811.

WILSON
v.
WILSON.

*Dall. St. Laws Append.* 2., it was provided, that the laws to be enacted here should be consonant to reason, and not repugnant or contrary, but (as near as might be. conveniently) agreeable to the laws, statutes and rights of the kingdom of *England.* The preamble of the " act for the advancement " of justice and more certain administration thereof," passed 31st *May* 1718, 1 *Dall. St. Laws* 133., recites " it to be a " settled point, that as the common law is the birthright of " *British* subjects, so it ought to be their rule in *British* do- " minions." The act of 28th *January* 1777, *Ib.* 723., immediately after the *American* revolution, declares, " that the " common law and such of the statute laws of *England*, as " have heretofore been in force, shall be in force, and bind- " ing on the inhabitants of this state, except as is thereafter " excepted." It would be a waste of time to cite more laws on this subject. Our statute book teems with the same language. But the act of 28th *February* 1780, *Loose Laws* 289. *s.* 3, 4, 5.; 13th *April* 1791, 3 *St. Laws* 93. *s.* 3. 16. 17.; 4th *April* 1797, 4 *St. Laws* 156. *s.* 2., and 2d *April* 1802, 5 *St. Laws* 158. *s.* 2., authorizing the trial of the feigned issue at *Sunbury*, may be particularly adverted to upon this point.

Whence then is it, that a court of justice is authorized to consider this part of the common law respecting the legal rights of executors, as inapplicable to this state? The legislature by a law passed on the 7th *April* 1807, 8 *St. Laws* 159. 1*st part*, have deemed it necessary to enact, that on a will not disposing of the residue of the personal estate, the executors shall distribute the undisposed residue among the next of kin. It is true, that nothing is affirmed or denied therein as to undisposed residues prior to the passing of the act; but the law furnishes a strong exposition of the sense of the legislature, as to the extension of the common law in the particular under consideration.

It has been objected, that testators never contemplate that the undisposed residue of their personal estates will pass to their executors. It is presumed that this observation would equally apply to the inhabitants of *Great Britain;* and likewise that as well there as here, it is not generally known, that a creditor making a debtor his executor thereby extinguishes the debt, *Hob.* 10., *Co. Litt.* 264 *b.*, 1 *Salk.* 300., un-

less it' is otherwise specially provided for, or the residuum of the estate be disposed of, *Cas. Temp. Talb.* 240., *Cha Ca.* 292., or there be a deficiency of assets to pay debts and legacies, 2 *Bac.* 380., 4 *Bac.* 269. So where a devise to a widow is not specified to be in lieu of dower, she is not precluded from dower. A number of vulgar errors have been enumerated by Judge *Barrington* in his observations on the ancient statutes, *Barringt. Stats.* 474. *4th ed. note* 2., which have been added to by Sir *Wm. Blackstone*, 2 *Bla. Com.* 53., and by *Christian* in his notes, 1 *Bla.* 401. *note* 8. But such mistakes cannot change the law, which every man is supposed to know.

It·is more formidably objected, that the legal right of the executor to the undisposed residuum is founded on the principle of a supposed compensation for his care and trouble, for which in *England* no allowance is made to him, 3 *Pr. Wms.* 249., and that he is only allowed his reasonable expenses. 4 *Burn's Eccl. Law* 416. He there has nothing but the management of the personal estate, 1 *Pr. Wms.* 553., unless it be otherwise directed in the will. Whereas by the laws agreed upon in *England* respecting the settlement of the colony, 1 *Dall. St. Laws App.* 22. *s.* 14., lands were made liable to pay debts, which were pursued by many subsequent regulations of the same nature, so that they became *quodam modo* chattels, and thereby introduced a radical change in the rights and duties of the personal representatives of deceased persons; and the act " for establishing Orphan's " Courts" passed in 1713, 1 *Dall. St. Laws* 99., authorizing them " to order the payment of such reasonable fees for " copies,' and for all other *charges trouble and attendance*, " which any officer, or *other person* shall necessarily be put " upon in the execution of that act as they should deem just " and reasonable," made an alteration in our municipal system, which destroyed the ancient rule of law in such cases.

These objections demand particular consideration. It is obvious that they are grounded on the assumption, that the legal principle contended for by the defendant, is bottomed on a supposed compensation for the care and trouble of the executor. But is this really the case?

I do not find that the elementary writers, either ancient

or modern, derive the foundation of the law from this source. In the old books it is uniformly spoken of as a gift or donation by the testator. *Wentw. Executor* 4. 5., *Swinb.* 40. 6th ed., 4 *Burn's Ecc. Law* 166. The executor takes all his personal property subjected to the payment of his debts and legacies; and it is presumed, that the testator had no more special will, than he had thought proper to declare. The fundamental presumption which the law makes, is, that the appointment of executors is a gift to them of what is undisposed of. It is true that in *Foster* v. *Munt*, 1 *Vern.* 473., a legacy of 10*l.* apiece to two executors for their *care*, was held to exclude them from taking a beneficial interest in the surplus. The decision went upon the ground, that the will afforded a reasonable conclusion that the testator meant to give each of them the legacy of 10*l.* for their trouble, and no more; for it would be absurd to give them expressly a part, if it were intended that they should have the whole; or according to a quaint phrase, they cannot take all and some. So in other cases.

I agree, that the general practice of this state is, for executors and administrators to charge for their trouble, in the settlement of their accounts, under the character of commissions; but I cannot collect from thence, that they exclude themselves from taking the undisposed surplus, where there is no reasonable presumption of a contrary intention in the will. I take it, that the origin of the legal right is to be ascribed to the bounty of the testator, when he nominates his executors. I see much danger in unsettling ancient established rules, unless on the most solid grounds. It is the office of the legislative branch alone to do this on grounds of public convenience. I know of but one decision, wherein this question has been solemnly determined in the tribunals of this state; but the observation of *M'Kean* Chief Justice in *Boudinot et al.* v. *Bradford* in *December* 1796, 2 *Dall.* 268., uncontradicted I may at least say by any of the members of this court, that there was no distinction between the law of *England* and *Pennsylvania* as to the point now under consideration, has in my idea considerable weight. The opinion of Mr. President *Wilson* in *Davis* v. *Davis's Executors* in *Delaware* county is to the same effect in *April* 1806. It

is incumbent on those who advocate a change in the old settled law, to shew some act of assembly or judicial determination authorizing such change. I know of no practice which has obtained on this particular point. I know of no opinions which have been entertained by the profession on it; and presume that many gentlemen differ therein. For myself, I can only say, that I can see no solid grounds upon which I can judicially pronounce, that this part of the common law is not applicable to our local situation and circumstances. What gave birth to it in the first instance has no weight in my mind.

It would afford me some relief upon the present occasion to be informed, how this legal question has been considered by the judiciaries of our sister states, wherein executors receive compensation for their care and trouble in administering on the estates of testators. I have been able to find but two cases of the kind in any of their reports. That of *Shelton's Executors* v. *Shelton,* 1 *Wash.* 64., in the court of appeals of *Virginia* in fall term 1791, wherein the residuary estate undisposed of was held to go to the executors, it being always the case, as *Pendleton* president remarked, where there are several executors, and unequal legacies given to them. Judge *Tucker,* 2 *Tuck. Bla.* 514. *note* 44., remarks on that decision, that it seems to have been settled thereby, that such undisposed residuum, where no intention of the testator to the contrary appeared, *did* belong to the executors; that neither a devise of lands, or other *real estate* to an executor, nor a legacy to a *brother* as such, without referring to his official character as executor, of money, or other personal property, (although the brother were likewise constituted an executor) was a sufficient manifestation of such an intention to the contrary, as to preclude him from taking the residuum as executor. This resolution more strongly applies to the question before the court, as in *Virginia* executors are intitled to compensation for their services. 1 *Wash.* 250.

In *Denn on the demise of Snedeker et al.* v. *Allen,* 1 *Pennington* 44., in *New Jersey* in *May* term 1806, Judge *Pennington* declared, that an executor was intitled to the residue where it was not disposed of in express terms; and he

recognised the practice of that state of allowing a reasonable compensation for services performed by an executor.

I have examined with some care the late reports of cases decided in the states of *Massachusetts, Connecticut, Vermont, New York, Maryland, North* and *South Carolina,* without success, for other decisions on this subject.

Upon this head of argument the matter thus stands. Upon the one hand, what has been called the individual opinion of *M'Kean* Chief Justice in this state in 1796, the solemn decision of President *Wilson* in *April* term 1806, and the two cases cited above in *Virginia* and *New Jersey,* assert the extension of the *English* law, though the executors are compensated for their care and trouble: and on the other hand, no case has been discovered of a different rule of decision adopted in any of our sister states, by the judicial departments thereof. I thus find myself in trammels from which I cannot escape; and I do not feel myself at liberty, from my private sense of possible individual hardships, to garble that common law, which we have heretofore prided ourselves in, and styled our *birthright.*

Believing, as I have been led to do, on the best consideration I have been able to give to the subject, that the law of *Pennsylvania* agreed as to the particular point before the court, previous to the late act of 7th *April* 1807, with the law of *England,* I proceed to consider the last will of *John Wilson* senior deceased. He devised to his son *John* the defendant the land whereon he lived in fee simple, and also his land in *Chester* county. To his two daughters, grandsons, and granddaughters, he bequeaths several pecuniary legacies, and to his widow *Jane* the plaintiff, the profits of the place whereon he lived, which after her decease was to fall into the hands of his son *John.* He ordered his land in *Leacock* township to be sold, together with 50 acres of his land in *Lampeter* township, and 100*l.* arising therefrom to be paid to his daughter *Margaret Hamilton,* and the interest of other 100*l.* to be paid to his daughter *Mary Teters,* and at her decease the money to be equally divided among her children; and he appointed his son *John* and his son-in-law *Robert Hamilton* his executors. *Hamilton* renounced.

I consider at present the rule to be, that making an executor does vest in him the personal estate of the testator,

unless a *reasonable* ground appears upon the will, that the testator did not intend by making that executor to vest in him the residue.

Considering this then as a question of *intention*, what reasonable ground does the will present to shew that the testator did not intend his executor should take the surplus? What circumstance or clause on the face of the will, will give our minds sufficient satisfaction in this particular? The rule of law is, that the appointment of executors vests in them all the personal estate of the testator not otherwise disposed of. The will contains a devise of lands to his son *John* both in possession and remainder, but he takes no legacy either pecuniary or specific. To his son-in-law *Robert Hamilton* there is no devise of land or legacy whatever. They are not called executors *in trust*, 2 *Vern.* 99., 2 *Pr. Wms.* 158., 2 *Atk.* 18., 2 *Ves.* 91. 495., nor do any other expressions occur in the will, shewing the *office* only to be intended them, and not the beneficial interest. I lay no stress on the circumstance of an only son being one of the executors, since notwithstanding the case of *Ball* v. *Smith*, 2 *Vern.* 675., it now seems settled, 1 *Pr. Wms.* 550., that even a wife appointed executrix, is as to the residue precisely in the situation of any other person appointed executor. In whatever light I view this will, I see no provision in it inconsistent with the executors taking beneficially the undisposed residue of the personal estate of the testator, and this renders it unnecessary for me to consider whether the form of the action has been misconceived.

I am of opinion that a new trial should be awarded.

BRACKENRIDGE J. The *claim* of an executor to the surplus, is *affected* by that of *the next of kin*, who may allege a better right on ground of *natural equity;* for the presumption is, that in the possession of property, there may have been some foundation laid by the acquisitions of a common ancestor; and the means of acquiring more, may not have been wholly independent of the line of progenitors. The natural obligation under which we are to help others, draws closer and stronger, the nearer they are related to us. Natural affection with most persons dictates this, even where

there is not a sense of duty and moral obligation. Nor is it left only to the strength of natural affection, or a sense of moral obligation; but the municipal laws of all, or of most nations, consult this. We find it in the customs of the *German* nations, from whence we deduce our laws and constitutions. " *Hæredes tamen successoresque, sui cuique liberi, et* nullum " testamentum: *si liberi non sunt, patres, patrui, avunculi.*" *Tacit. de Mor. c.* 21.

" The name of *Saxons,*" says *Gibbon, Rom. Hist. v.* 2. 276., " escaped the notice of *Tacitus;* yet it is that in which we " have a near and dear domestic interest, these and their " auxiliaries, who so long defended the liberty of the north " against the arms of *Charlemagne,* having filled the *British* " islands with their language, their *laws,* and their colonies." After the settlement of these in *England,* it is recognised as a principle at an early period, " *possessiones uxori, liberis,* " *et cognatione proximis, pro suo cuique jure, distribuantur.*" 2 *Black. Com.* 492. At this time it would seem to have remained the law, that an ancestor could not deprive his next of kin of this right by testament. " But though the origin " of devising, (continues the commentator) cannot be traced, " yet the law by imperceptible degrees was altered, and the " deceased may now by will dispose of the whole of his es- " tate." And where there is a will, and an executor appointed, the next of kin do not succeed immediately to the possession *even of that part of the property* which may be undisposed of by the will; because it is necessary that the testamentary trustee the executor, take the possession of the whole to execute the purposes of the will, until after which, it cannot be ascertained that there is a *surplus.* It would seem also reasonable that after paying debts and legacies, he should have a lien upon the surplus, for a compensation for his trouble. And that this is considered as a ground on which the surplus can be retained, would seem from this, " that wherever courts of equity have seen, on the face of a " will, sufficient to convince them that the testator did not " intend the executor to take the surplus, they have turned " him into a trustee for those on whom the law would cast " the surplus in case of a complete intestacy, that is the next " of kin." 1 *Pr. Wms.* 550., and *Bro. Chan. Cases* 328. " A

"legacy given for care and trouble excludes the surplus."
Where that is not the case however, the "executor though
"not named residuary legatee, shall take the residuum." 1
*Com. Di.* 359.

In the citation from *Peere Williams*, the term *complete* in-
testacy would seem to distinguish the devise of a *whole* and
a part.

I have not been able to trace when this claim of the
executor came to be the law; *the right to the residuum*. It has
been said, that from the constituting an executor, a presump-
tion arises of *intending a benefit*. The only presumption that
strikes me, is that of a confidence in his understanding and
care, and in his good will to do the deceased a service, by
the fidelity of fulfilling the trusts of the will, and distribution
of the *surplus for the next of kin*. May not this idea of a
right to take the residuum, have crept in from a misappli-
cation of the general terms that are used in treating on this
subject; which are, that the constituting an executor *is a gift
in law, or donationary estate?* It is true; but with this
qualification, that it is but a *special property* that is given,
not an absolute. It becomes his, not to such extent as *to be
liable for his debts, or devisable.* "His assignees under a bank-
"ruptcy cannot take it." 3 *Bur.* 1369. This principle equal-
ly applying to the surplus in favour of the next of kin, may
have been overlooked, personal property at an early period
being small, and the surplus still less, after satisfying the
dispositions of a will. Or it may have been suffered to re-
main uncalled for by the next of kin, under an idea of being
applied in *requiem animæ of the testator himself;* following
the law in the case of intestates' estates, at a time when the
church succeeded to *the king* as the general trustee in such
cases, and thought themselves justifiable in considering it
a conscientious discharge of the trust, to apply the property
rather in *pios usus*, than for *the next of kin*. It could not be
disputed, but that according to *the notions of these times*, the
most pious use was that of saying masses for the soul of the
deceased. And though in the case of a *lay executor*, he
could not himself say mass in consideration of the resi-
duum, or perform the spiritual service, not having a spiri-

WILSON
v.
WILSON.

tual authority, yet he could procure it to be performed by those who were qualified.

But however founded, or in what manner introduced, was this such a principle as was necessarily carried with the emigrants to this province in their colonization? Not if the reason of the rule had been the saying masses in *requiem animæ;* because there was no spiritual authority known to the colonial laws, that could *render the service;* and we have historical evidence, that the greater part of the emigrants were unbelievers as to the efficacy of a mass in benefiting after the decease.

But supposing it to be carried as a principle of the common law into our colonization, as applicable to our circumstances, being founded either on the idea *of a gift ex voluntate,* or a compensation *for trouble* in executing the will, has it not been extinguished by the early acts of the province legislature, or *since* under the state? There are acts at a very early period, providing for the distribution of intestates' estates. Do not these comprehend intestacy even *as to part?* " In case a person made no disposition of such " of his goods as were testable, whether that were only part " or the whole of them, he was, and is, said to die intestate." 2 *Bl. Com.* 494.

But independent of this construction, and meeting that which is the only rational foundation of the claim of the executor, a compensation for trouble, by the act of 1713 a power is given to the Orphan's Court over executors in the case of minors to compel to account, and to allow " rea- " sonable fees for charges, trouble, and attendance in the ex- " ecution of their trust." Has not this act, by an equitable construction, been extended to the case of *the next of kin,* so as to allow compensation to executors in all cases of the settlement of accounts under will. By subsequent acts, particularly that of 1797, *which would seem to be declaratory of this construction,* executors are made compellable as to this particular, on the application of any one interested in the real or personal estate of any decedent, " to give bond " with sureties to the Orphan's Court, and to account in such " manner and time, as the said court according to the usual " course of proceeding in the case of administrators *shall*

"*award and order.*" This must comprehend the allowing reasonable fees for trouble in executing the will.

By a preceding act of 1794, sec. 3d, it is provided, that the "*remaining part* of any lands, tenements or heredi-"taments, and personal estate of any person deceased, *not* "*sold or disposed of by will*, nor otherwise limited by mar-"riage settlement, shall be divided and enjoyed in the pro-"portions and distributions therein regulated, in favour of "the wife, children and *next of consanguinity.*" These words, "not sold or disposed of by will," suppose a will, and a sale or sales directed under it, and dispositions made by it as to *some part*, and not as to the whole. What but the surplus in this case could there be to make the subject of the provisions of the section? The very technical term is used, "*remaining part*," the residuum undisposed of by will; that is the surplus. I presume the claim in the case before us must be of the residuum of a testator before the act, and to which it might be thought this act could not retrospectively apply; otherwise the provision is so express that a doubt could not arise. Yet it is to be observed, and I cite it for this reason, that this act is intitled "An act directing the de-"scent of intestates' real estates, and distribution of their "personal;" which shews that the legislature contemplates intestacy *as to part, even where there is a will.* This act I take to be declaratory of what the law was before, and with a view to remove doubts* which had come to be entertained, in consequence of what has been reported to have been said, 2 *Dall.* 268., which must be taken with some qualifications. For though generally speaking, both in legal and in popular acceptation, *intestacy* refers to a case where *there is no will*, yet it also embraces the case where *there is a will*, but no disposition *as to some part;* as to which, it is the same thing as if there was no will. This in the express words of the commentator, 2 *Black. Com.* 494. " In case a person "made no disposition of such of his goods as were testable, "whether that were *only part*, or the whole of them, he was, "*and is said to die intestate.*" Though it be true therefore that "*the next of kin* are intitled to personal estate only in "the case of intestacy," yet where there is no disposition of the *whole* under a will, it is a case of intestacy as to the part undisposed of. Nor would the court or those of them

who may in the year 1796 have thrown out the *obiter dictum* referred to, seem to have adverted to this act of assembly of 1794, or to the preceding acts and legal history of the province; or I take it they would have sanctioned the position of the counsel, (*Ingersoll*) " that as to the residuum of per- " sonal estate undisposed of by the will, the executor, in " *Pennsylvania*, holds it only as trustee for the next of kin," and which I now deliver as the result of my investigation as what ought to be considered as the law.

With regard to the capacity in which the defendant is called upon to answer for the surplus, whether he ought to be declared against as an executor, or as trustee merely, it may be observed, that in order to determine where one who is executor must sue as executor, it must be inquired, can he sue otherwise in that particular case than *as executor?* And the reason is, because suing as executor in *England*, he is *exempt from costs* to the defendant; and having this immunity, it is just that he be restrained to cases where he cannot *sue otherwise.* The cases in which one who is sued by an executor, has a right to call for a proceeding *as executor*, are where the executor can sue as executor; for the law not giving a defendant costs, save where one being executor proceeds in his own right, it is reasonable that the sphere of the immunity be confined to strict bounds. This reason which exists in *England*, has no place with us; for by the usage of *Pennsylvania*, costs follow the verdict in all cases not excepted by act of assembly. The ground therefore is narrowed; and perhaps the criterion of *Buller*, 4 *T. R.* 280., may be adopted here, as to the bringing actions in a personal or representative capacity, and as to joining counts in the same declaration, " *will the demand when recovered go into* " *assets?*"

Again, where one is made defendant as executor, even here where he recovers or pays costs as the verdict may be for or against him, yet he has different pleas, and the judgment differently affects him, both as to what shall be taken in execution, and as to the recovery and evidence of the demand barred; so that there is good reason why one who is executor shall call for a proceeding against him *eo nomine.* And in a case where the defendant could be sued as executor,

I would hold a plaintiff to that action. The question then will be in the case before us, *could the defendant be sued as executor?*

The execution of a will can respect only the dispositions of a will, in executing which it cannot but be that the surplus will be thrown upon the executor; but it is not a subject of the testator's disposition. It comes to the executor, but it is not *as executor* that he takes it, unless specially so appointed by the will; and then it becomes a subject of the disposition of the will, that he shall be intrusted with it. In that case he could not be sued *but as executor.* But where his being executor *is but the mere occasion of its coming into his hands,* he cannot be considered as executor *quoad hoc;* and in strictness a suit could not be sustainable against him under the denomination of an executor, not even under the idea of *an executor of his own wrong,* for he could not be said to have *meddled wrongfully* with the property, it having fallen upon him in the course of a lawful act, unless by his detention after a demand, he might be considered an executor of his own wrong. But certainly it cannot be necessary to consider him in that light. The idea of a tortious act may be waived, and he may be viewed in the light of a person having money in his hands for the use of those intitled to receive it. *Non constat* necessarily that he will claim it for himself. The law will not say that it is necessary to presume the worst, or to give the worst names to things. If I place my eye simply on the surplus without looking at the will, as I have a right to do, (for it is not under the will that I claim it, but under the law which gives it to me,) I do not see the executor and am not bound to see him. I see only one to whose hands the property has come to which I have a right. My claim reaches the subject of this demand, antecedent to the will, and independent of it. It attaches on the testator's decease, to the thing, and before it can be supposed to come to the hands of the executor; though nevertheless the mass of the property must pass through his hands, before this can be separated; yet this surplus must be viewed as existing distinct at the decease, from that which could be operated on by the will. I can see no possibility of connect-

1811.

WILSON
*v.*
WILSON.

ing the executor with the testator as to this undisposed part of the estate; and as executor, unless it be as executor in his own wrong, after demand made, an action could not be sustained. But the strictly technical and proper proceeding is against him *as a stakeholder*, or *trustee*. It is a proceeding against the executor *as such*, that I speak of, as that which could not be supported. The bare naming him executor, may be taken as descriptive of *the person*, and not as of *the capacity* in which he is called upon to answer, and may be rejected as surplusage; more especially in this case, where he is named executor in the writ only, and the declaration is against him in his personal capacity.

It is a more solid objection, that the declaration has not been more special, stating the way and manner in which this surplus has come to the hands of the defendant. Certainly such declaration gives no more notice of the ground of the demand than the *writ itself;* and were the case new, I should be willing to turn the plaintiff round to a new trial, and on payment of costs give him leave to amend his declaration; for such a want of specification ought not to be encouraged. A bill in equity in *England*, which is the proceeding in this case, must set forth specially the ground on which relief is prayed; and this which is in lieu of the bill in equity, ought to do the same. Though a declaration *for money had and received for the use*, is the truth of the case, yet there *is more in the case*, which ought to be shewn; viz. the *way and under what circumstance* the money has been received for the use of those interested to receive it.

But this mode of declaring has got a footing, and received the countenance of courts, which would *make it a surprise in a particular case* to exclude it. This laxity of declaring may be helped by the defendant calling for a specification, which the court would certainly direct.

In the case before us it is not alleged that the want of a more specific statement in the declaration has been the occasion of surprise to the defendant; but the objection is raised merely of being technically exceptionable. The justice of the case having been reached, I incline to think the court is not under the necessity of setting aside what has been done,

for the sake of any general principle of law or practice which might be affected. I give judgment therefore so far as my opinion goes, for the plaintiff.

1811.

WILSON
v.
WILSON.

New trial refused, and
Judgment confirmed.