MORROW, for the use of the Heirs of ISETT, *against* BRE-    <sup>2r 185</sup> 161 188
                         NIZER.                          2r    185
                                                        220    ¹ 88
                  IN ERROR.                             j220   ¹ 97

Where a testator orders his property to be sold by his executors, after the de-
cease of his wife, and the monies arising therefrom to be divided among his
children, and empowers them to rent the premises, if they cannot sell, a levy
and sale of a share of the real estate, under a judgment against one of the
children, does not pass any interest of such child therein.
An action for a legacy lies against the executor, in his individual capacity; so,
of an action for a distributive share against an administrator.
Still, the defendant is entitled to a refunding bond.
An executor is chargeable as such, only on the engagement or covenant of his
testator.
*It seems*, an executor is within the purview of the acts to compel assignees to
settle their accounts, empowering the court to displace a negligent trustee,
and appoint another in his stead.

Error to the Court of Common Pleas of *Cumberland* county.
Assumpsit for money had and received. The plaintiffs in error
were plaintiffs below.
In the court below, a special verdict was found, on which, that
court gave judgment for the defendant.
*John Brenizer*, in his life time, and at his death, was seised in fee
of a tract of land, in *Allen* township, *Cumberland* county, contain-
ing 215 acres; and made his will, dated the 25th of *July*, 1805, which
was duly proved and registered in *Cumberland* county, on the 5th
of *July*, 1816, whereof the defendant was appointed executor, and
took upon himself the execution thereof. The said testator left
eight children and heirs, of whom the defendant, and *George Bre-
nizer*, were two. The said *George* having executed to *Henry Isett*
a judgment note for two thousand dollars, dated the 20th of *June*,
1814, judgment was thereupon confessed, and entered of record, in
the said court, on the 1st of *July*, 1817, No. 263 of *April* Term,
1817, the balance of the debt and interest then being fourteen hun-
dred and two dollars, and sixty-two cents. A *Fieri Facias* was
issued thereon, No. 41 of *April* Term, 1818; in pursuance whereof,
*Andrew Mitchell*, Esq. then sheriff of the said county, levied on
the one undivided eighth part of the said land, and of another tract
of seven acres, adjoining the same, as the property of the said
*George Brenizer;* an inquisition was held thereon, and the pro-
perty condemned. A writ of *Pluries Venditioni Exponas* issued,
No. 132, of *August* Term, 1819, and the said property was sold by
the said sheriff to the plaintiffs, *Morrow* and *Fleming*, executors,
&c. in trust, for the heirs of *Henry Isett*, deceased. A deed was
made, dated the 7th of *August*, 1819, and duly acknowledged on
the 3d of *November*, 1819.

VOL. II.                        2 A

(Morrow, for the use of the Heirs of Isett, *v.* Brenizer.)

On the 9th of *September*, 1816, the defendant, *David Brenizer*, paid *George Brenizer* six hundred dollars, and took his receipt, in the following words: " Received, *September* 9th, 1816, of *David Brenizer*, executor of the estate of *John Brenizer*, deceased, six hundred dollars, on account of my legacy, or whatever may lawfully come to my share, after the said *David Brenizer*, executor, make sale of all the real and personal estate of my father, *John Brenizer*, deceased, with lawful interest from the date above written.          " *George Brenizer.* "

The following notice was served by the defendant on Sheriff *Mitchell*, on the day of its date, and posted up on the court house wall, viz:

" Sir—Take notice, that the land which you have advertised for sale, as the property of *George Brenizer*, does. not belong to the said *George*, but is part of the estate of my father, *John Brenizer*, deceased, of which I am executor; and that the said *George* has no claim in the said land, being only entitled to a legacy in money, under the will of his father, of which I paid him six hundred dollars, on account.          " *David Brenizer*.

" To *A. Mitchell*, Esq. Sheriff of *Cumberland* county.

"*August* 3, 1818."

On the 11th of *November*, 1819, the defendant entered into articles of agreement with *John Wist*, for the sale of two hundred and fifteen acres; and the said *Wist* has paid the hand money and gales hitherto falling due, to the defendant, agreeably to the said articles.    The defendant has settled an account of his administration of the estate of the testator, and received the monies therein charged to him, and paid out the monies credited to him.

The plaintiffs are the executors of *Henry Isett*, who died after the levy, and before the sale.    These questions, therefore, arise for decision, viz:

1. Was the said judgment a lien on the said *George Brenizer's* interest in the said land?    Or did the said levy, and sheriff's sale, transfer any right to the plaintiffs?

2. Can a suit, under the circumstances stated, be supported at all; or, if it can, can it be supported in the names of the present plaintiffs, or must the suit be in the name of the said *George Brenizer*, for the use, &c.

3. What is the effect of the said receipt, for six hundred dollars, on the rights of the parties?

If the court shall be of opinion with the plaintiffs, judgment to be entered for them, for such sum as the court shall order; if for the defendant, judgment to be entered for the defendant.    The papers herein referred to, to be considered as parts of this special verdict.    The said *Isett* and his executors resided in *Greensburg*, *Pennsylvania*, at the times mentioned.    Out of the personal estate, the defendant, as the administrator of his sister *Barbara*, re-

(Morrow, for the use of the Heirs of Isett, *v.* Brenizer.)

tained fifty pounds, the amount of a pecuniary legacy to her; and also, fifty pounds for her services, agreed to be due to her by the testator, on his death-bed; which sums are not credited to the defendant, in his administration account of the estate of *John Brenizer,* deceased, and which sums were retained by the defendant, as administrator of the said *Barbara,* who died about the 6th of *December,* 1820.

The court below gave the following opinion:

"The exception to the form of the suit is fatal. The claim for a legacy is not *ex contractu.* There is, therefore, no implied promise to pay. It is not founded on any kind of contract. *Walker's Executors* v. *Wiley and Wife,* 12 *Serg. & Rawle,* 96. *Wilson* v. *Wilson,* 3 *Binn.* 557. It is a good consideration for a promise; but here, no express promise is alleged.

"The defendant sold the land exclusively under the powers in the will. He received the money under the will exclusively, as executor of the estate. He held it for the uses of the estate, to be applied and appropriated under the laws of the commonwealth, and the provisions of the will. The will is the title by which the plaintiffs claim the money. If their claim is not good, under the will, they have none other. The defendant, therefore, has a right to resist any suit against him as executor. As executor, he might have pleaded in abatement, the want of a refunding bond. The plaintiff, by shifting the liability, cannot deprive him of this right. As we deem this point conclusive, it is unnecessary to examine any other."

Extract from the will.—"As to such worldly estate, &c. As soon as convenient, after my decease, all my property, real and personal, shall be sold at public sale by my executors, hereinafter named, and the monies arising therefrom, to be equally divided among my nine children, excepting *Barbara* is to have fifty pounds more than any of the rest of my children; to be paid to her, by my executors, out of the first money that comes to hand arising from my estate. And, as I have already advanced to *John* fifty pounds, for which he has given me a bond, it is my will, that my son *John* shall not receive any more monies arising from my estate, until each of my other children shall be made equal with him, &c. Out of the monies arising from my personal estate, and hand money of the plantation, all my children shall be made equal, excepting *Barbara's* fifty pounds, over and above any of the rest of my children. And all the sums charged against my children in my book, to be settled out of the first monies arising out of my estate, still reserving *Barbara's* fifty pounds. After all are made equal, the residue of the purchase money of my plantation to be equally divided among my nine children, to wit, &c. to them, their heirs and assigns for ever, to be paid to them as hereinafter directed.

"And it is my will, that my executors shall have full power to give a clear and indisputable title to the purchaser, or purchasers, of my

(Morrow, for the use of the Heirs of Isett, *v.* Brenizer.)

lands. And, if my executors should not be able to sell my lands, shortly after my decease, it is my will, that they shall rent the place to the best advantage, until an opportunity offers. *Michael* and *David Brenizer* to be executors."

*Alexander*, for the plaintiff in error.

*Carothers, contra.*

The opinion of the court (Huston, J. dissenting,) was delivered by

Gibson, C. J.—A majority of the court are for adhering to the decision in *Allison* v. *Wilson's Executors*, 13 *Serg. & Rawle*, 330, without absolutely assenting to the propriety of it on original grounds. For myself, I cannot bring my mind to doubt its propriety on any ground. The opinion of the court was not, as has been supposed, rested exclusively on the authority of *Craig* v. *Leslie*, 3 *Wheat.* 563. An intimate knowledge of the eminent men with whom I was associated, enables me to say, the result would have been the same, had that case never been decided. They were too familiar with the principle on which it depends, to let it escape them; and too sensible of the danger to be apprehended from a contempt of precedent, to disregard it. That case was particularly noticed by the judge, who delivered the opinion of the court; not as absolutely ruling the cause, but, as enabling him to to refer to the learning of the subject, without the appearance of a display. There has been no attempt here to contest the positions of Judge Washington; and the attempt to distinguish between the case of a volunteer, and that of a purchaser, has failed. A purchaser from a volunteer, acquires no additional equity; his is the case of a volunteer still. And this is emphatically the case of a purchaser at sheriff's sale, who, by the express provisions of the act of assembly, acquires nothing but the interest of the debtor. This ground failing, the argument is necessarily reduced to a dependence on our peculiar usages; by which it is supposed, that a judgment is a lien on every possible interest in land, whether immediate or remote, actual or contingent. This takes for granted, that the legatee had, in fact, an interest *in the land.* I shall attempt to show, that, according to the apprehension of even simple and unassisted reason, he had not. But, it is proper to remark, that both the major and minor are untrue. The interest of a mortgagee, judgment creditor, owner of a legacy charged on land, creditor of an intestate estate, mechanic, or material man, or of a preferred creditor, under an assignment to trustees, (to each of whom the land is debtor,) is not the subject of judgment and execution. Nothing is such but an immediate interest; as, for instance, the estate of a tenant by the curtesy initiate; or of a widow, whose interest is put, by the intestate acts, on the footing of a rent charge. The only thing peculiar to a judgment with us, is, that it binds an equitable, or even an inchoate, interest; but that interest must be an ESTATE in the land.

(Morrow, for the use of the Heirs of Isett, *v.* Brenizer.)

It will not be disputed, that a father may, if he thinks proper, bequeath to his children the value of his land in money, without giving them an estate in the land itself.   Now, he does bequeath it thus, when he devises the land to the executors, with directions to sell it, and distribute the price among his children.   Who can say, that he resorted to this for the sake of convenience, as regards partition, and not for the very purpose of providing for the children, without exposing his bounty to interception, by their creditors? Where such is the object, I know of no rule of policy or law to forbid it.   He gives his land to trustees, and the objects of his bounty are expressly to have no estate in the land, but an interest in the execution of the trust.   The natural and strict import of the words is, that the children are to have money, and not land; so that their interest is not, as stated at the bar, changed from land to money, by the magic of a fiction, and contrary to the dictates of common sense.   On the contrary, it requires a fiction to make it any thing else than money; and we, accordingly, find the law invokes the aid of such a fiction, to create a resulting trust, in respect of the surplus, after the objects of the trust have been satisfied.   As the equitable estate in this, is undisposed of by the will, it is held to be a resulting interest, which descends to the heir, not as money, but as land.   But this fiction does not hold, even in favour of the heir, where the whole estate, legal and equitable, *passes by the will;* and, consequently, where the testator himself has determined the character of the bequest to subserve some necessary purpose, which he had in view, I deem it unnecessary to resort to authority, to show, that in such a case, there is no resulting trust to the heir.   But, the character of money is indelibly impressed, where the object is, equality of distribution; and for this plain reason, that it cannot be effected while the estate is land.   As, then, the testator ordered his land to be turned into money, that he might give his estate equally among his children, it necessarily could pass only by the will, and, consequently, as money.   This appears to me a satisfactory answer to the argument, that, as nothing was given to the children but what they would have inherited, they necessarily took by descent.   It was necessary, to the purposes of the will, that the quality of their interest should be changed; and they could, therefore, take only by purchase.   They might, indeed, have elected to take the land itself, instead of the price of it.   But their right, in this respect, is a consequence of their power to control the event; being the only parties beneficially interested.   As they can produce the same result, by purchasing at the sale of the trustees, chancery considers them as having an equitable estate in the land, and directs the trustees to convey the title, the moment they signify an intention to call for a conveyance; an actual sale being dispensed with, as an unnecessary formality.   But, even then, an estate in the land is not vested by descent, but by an act of their own, which is equivalent to a purchase.   The fiction may be said to exist, where the party benefi-

(Morrow, for the use of the Heirs of Isett, *v.* Brenizer.)

cially interested has an estate in the land, previous to the period of conversion. But, where the title has passed immediately from the testator to the trustees, the party to be benefited has no estate in the *corpus* of the devise, either as land or money, but only in the execution of the trust, because he has no title to go into equity for any thing else; at least, before he has elected to be treated as a purchaser. Previous to the act of 1792, by which the devise of a naked power to sell vests the estate, there might have been such a case; but, even the *English* courts begin to consider the descent as broken, by a naked power to sell, inasmuch as the vendee is in by the devise.

If, then, in a devise to sell, and distribute the price, there is a plain inartificial intent to give an interest merely personal, what beneficial purpose could we effect, by declaring it to be an estate in the land? That equality of distribution among creditors, is more consistent with natural justice, is manifest, from the eagerness of every chancellor to treat the proceeds of land sold, for the payment of debts, as equitable assets. As regards the case before us, there certainly would be no natural justice, in giving a preference to the creditor who first obtained a judgment against the legatee. As it is, he will come in *pari passu*, under the intestate acts, instead of sweeping the whole from the other creditors. It is said, the interest of the children, if personal, would be exempt from execution. But, so is the interest of a mortgagee, and every other sort of creditor, whose debt is secured by a lien; their interest can be reached only through the person. It has been objected, that recourse to the person might be ineffectual, as the legatee himself could not compel the executor to perform the trust. This would be an imposing argument, did the law depend on our discretion. But, it seems to me, the case of an executor is within the purview of the acts, to compel assignees to settle their accounts, which empower the court to displace a negligent trustee, and appoint another in his stead. There would, therefore, be no peculiar expediency, even here, in subjecting the interest of the legatee to execution. On the other hand, in addition to the inconvenience inseparable from entails, and executory devises, as well as those other intricate and perplexing limitations, of which real property alone is susceptible, there would be substantial injustice, in attributing to such a legacy the qualities of land, and thus subjecting it to curtesy, and dower, instead of giving the husband or wife an absolute ownership; and particularly, in excluding brothers and sisters of the half blood from the succession. Other mischiefs would undoubtedly be produced; but these are sufficient, to demonstrate the justice and policy of the decision in *Allison* v. *Wilson's Executors*, as applicable to devises of this sort, even in *Pennsylvania*.

Whatever may be our opinion of the fitness and policy of the rule, I submit, that we have no authority to dispense with *its* obligation. One would think, that, having been firmly established by the *English* court of chancery, previous to the *American* revolu-

(Morrow, for the use of the Heirs of Isett, *v.* Brenizer.)

tion, since recognised by the Supreme Court of the *United States,* and finally adopted by the concurrent opinion of the judges of the court of the last resort in *Pennsylvania,* and having in consequence, been relied on (as I know it to have been in more instances than one,) by counsel in advising their clients, it ought not to be disturbed now for reasons purely technical, and without its having proved seriously detrimental in practice, which is not pretended. But aside from this. No evil is so pregnant with mischief to the suitors, or inconvenience and difficulty to the judges, as the introduction of a judicial discretion in the adoption or rejection of any part of the law; particularly, the law of real property, which Mr. Justice BLACKSTONE, in his argument in the celebrated case of *Perryn* v. *Blake,* justly designates as "a fine artificial system, full of unseen connexions and nice dependencies;" and of which he truly observes, that he who breaks one link of the chain, endangers the dissolution of the whole. In place of this system, consisting of a regular train of premises and consequences, and possessing all the simplicity, as well as, in a great degree, the certainty of mathematical demonstration, what would we obtain by subjecting it to the crucible here? After a century or two, of judicial bewilderment and individual endurance of the evils consequent on insecurity of titles, we might, perhaps, build up a system of our own; but, that it would be more simple in its structure, consistent in its parts, certain in its conclusions, or useful in practice, may admit of a doubt.

The defence was, however, sustained on exceptions to the form of the action, which it is proper, though not at all necessary to examine.

Granting the action to lie, it was said, that it ought to have been brought in the name of the legatee for the use of the purchaser at sheriff's sale. An action could be sustained, if at all, by the purchaser, only on the ground of his having had an estate in the land, and his consequent ownership of the price of it when turned into money. The promise to be implied from such a consideration, would be to him in his own right, and consequently an action on it would be in his own name.

It is also supposed, that an action could be maintained against the executors only in their representative character. As to this, I take an action for a legacy to be in all respects on a footing with an action for a distributive share of an intestate's estate; and I take it to be a rule subject to no exception, that an executor is chargeable as such, only on the covenant, or engagement of his testator. It is held, that a testator cannot bind his executor, where he has not bound himself; and, on a covenant, that the executor should pay ten pounds, it was held, that an action did not lie. *Cro. Eliz.* 232. The propriety of this decision has been doubted, and with reason, because the testator bound *himself,* although for the act of another, and on a consideration in his life time. This being so, the period of performance was immaterial to the existence of the responsibility.

(Morrow, for the use of the Heirs of Isett, *v.* Brenizer.)

But, for rent accruing subsequently to the testator's death, the executor is personally liable; and, if he enter on the demised premises, as by his office he is bound to do, the lessor may charge him both in the *debet* and the *detinet*. 1 *Salk.* 297. In *Strohecker* v. *Grant*, 16 *Serg. & Rawle*, 237, it was determined by this court, that an executor cannot bind the estate by a covenant of warranty. Thus, we see, he is liable as executor only for the contracts of his testator, and cannot covenant, or promise as such, or shelter himself under his representative character, in respect of acts to be done by him. What then is the form of the declaration in an action for a legacy, or a distributive share? There has been no actual promise by the decedent, nor will the law imply one, because there was no duty, or consideration in his life time. The promise, or duty, which supports the action, must necessarily, therefore, be the promise or duty of the executor himself. The judgment ought not to be *de bonis testatoris;* for that would subject the land to execution in the hands of the heir, to discharge a legacy, payable out of the personal estate, or a thing bequeathed specifically, to be taken in satisfaction of a general legacy. Of the personalty there could, in the case of an intestacy, be no execution; for before the distributive shares could be ascertained, that would have to be turned into money: so that if the heirs were protected from execution, as they ought to be, a judgment *de bonis intestati*, would produce no other effect than to render the administrator consequentially liable in his individual capacity, by an action on the judgment, suggesting a *devastavit*. Better render him liable at once. But there would be no evidence of *devastavit*, except the return of *nulla bona;* and the action would, therefore, be founded on the absurdity of fixing the administrator with a *devastavit*, for having done what was his duty. The act of withholding what belongs to another, after the purposes of the office have been answered, is the individual wrong of the person so withholding, and seems to be appropriately the subject of an action for money had and received. Still, however, the defendant would be entitled to a refunding bond, which is intended to secure him from injury as well as the creditors. Where a distributive share is recovered in the Orphans' Court, the process is against the person of the administrator; and the legislature has certainly viewed him as answerable in the same way, by enabling the parties in interest to make the balance of his account a lien on his land. But the point has already been decided in *Wilson* v. *Wilson*, 3 *Binn.* 557, where it was determined, that *assumpsit* for money had and received, lies against an executor in his individual capacity, for a share of the estate undisposed of by the will. If, then, the action is to be maintained on a promise implied from the consideration of indebtedness, it is immaterial in what capacity the money, which is the meritorious cause of the action, came to the defendant's hands.

We are of opinion, that the interest of *George Brenizer*, under his father's will, did not pass to the plaintiff by the sheriff's sale;

(Morrow, for the use of the Heirs of Isett, *v.* Brenizer.)

but, that if it had so passed, an action for the price of the land might have been maintained in the present form. The judgment, therefore, is to be affirmed.

HUSTON, J.—I have not been able to see this matter in the point of view taken by the rest of the court.

I admit the doctrine is established in *England* and in *Virginia*, that land devised to be sold, and the price paid over to a particular person, is to be taken as personal property; and, that money directed to be laid out in land, is to be taken as land. But I do not admit, that the whole law on this subject is to be found in *Roper* v. *Ratcliffe*, 9 *Mod.* 167, 181; and still less, that it is to be got from *Craig* v. *Leslie*, 3 *Wheat.* 563. The desire to give full effect to the statutes against papists may have influenced the first case, though I do not say it did; and it may be, that in the latter, some idea, that the law of *Virginia* was rigid or illiberal, induced the court to consider the question as an abstract matter of general law, which it was not. I will not foretel what our successors may say of that case; nor say, whether it is right to be more liberal in the construction of *English* aliens, than they have been to others.

But I believe it to be perfectly immaterial what the law on this subject is in other countries; if it has not been the law here, I see great objections to introducing it. In *England*, it is adhered to strictly in one case: money devised to be laid out in land, does not go to creditors, unless their debts bind land. In this we need not follow them, for here all debts bind land. It, even there, is not a common law doctrine; it is one depending on the system of conveyancing, of devising peculiar to that country, and not so applicable to this. It seems to me, it cannot be adopted to any good purpose, unless where there is a Court of Chancery. It is greatly complex, and in some of its features, inconsistent. It is far from being universal in all cases. To descend to particulars: the rule does not apply where the object for which the sale was to be made ceases. The power to sell is then at an end, and lands continue lands. 1 *Binn.* 528. 8 *Wheat.* 531. 6 *John's. Rep.* 73. 1 *Br. Ch.* 86. It ceases where the title to the money and the land, come by descent to the same person, for a bill would not lie by a man against himself, to compel a sale.

The rule ceases to exist where the intention is obscure or uncertain. Money devised to be laid out in land, may, by the owner of it, pass by a will not attested to pass lands. *Edwards* v. *Warwick*, 2 *P. Wms.* 171. Nay, it may be disposed of by parol. *Ibid.*

The husband shall be tenant by the curtesy of the money of the wife to be laid out in land. 2 *Vern.* 536. 1 *P. Wms.* 172. But the wife shall not be dowable of the husband's money to be so laid out. This I suppose was because the law was not settled by women.

No act of record is necessary to change its description. An act *in pais*, even the intention to be collected from circumstances will

(Morrow, for the use of the Heirs of Isett, *v.* Brenizer.)

change it. Length of time alone will do it, and make it continue what it has continued. *Pultney* v. *Darlington,* 1 *Br. Ch.* 210. See this case at large, for though we may not cite it as authority, showing what the law is here, it is perfectly allowable to refer to it to show the confusion and uncertainty attending this branch of the law as it stands in *England.*

The husband may elect to take it as money against the heir at law of the wife. 1 *P. Wms.* 172. 3 *Atk.* 254.

The intention to give it as personal estate, though not distinctly expressed, if it can be collected from the will of the person entitled to it, will make it personal. 3 *Atk.* 254. 1 *Br. Ch.* 236. And, says the chancellor, "I hardly know any thing that is not sufficient to show such intention." *Ibid.* If got from the trustees by a decree, it is personal. So, if the trustees pay it to the person entitled, without suit. *Ibid.* The result of all the cases is, that the slightest intention to take it as money, will make it so. *Ibid.*

I might swell the list *ad infinitum.* The amount is, that to keep off all but bond creditors, to favour the heir at law, and to give a tenancy by the curtesy, it is land. For all other purposes, money to be laid out in land, is money. The slightest act, any colour of intention, changes it even against these. Length of time alone will do it. "If," says the chancellor, "it is subject to be laid out as land for fifty years, shall the heir come for it at the end of that term? It would lead to infinite inconvenience." Can the court decide that it is land or money, as a jury may say, appears to have been the intention of the owner?

But, it is said, the devise to a person and his heirs to sell, breaks the descent to the heir, and he can never claim. This is true, only with great limitations, as will appear from the cases cited above. The power to sell ceases when the object ceases. It ceases when the right to the money and the land unite in the same person. It always ceases where one of the devisees dies, so that the legacy lapses; and so far the heir takes. And where the money to be raised is to go to the heir, the descent is never broken for a moment. *Cook* v. *Duckenfield,* 2 *Atk.* 565, 568. 1 *Br. Ch.* 504, 515. But there are difficulties in the way here which do not exist in *England.* There, in all cases it descends to one heir at law, (except in case of parceners;) here, it almost always goes to more than one. We have no heir at law, except where only one person stands in the same relation to the deceased. Here, we have no court who can compel a sale by the executor; one heir may ask a sale, another ask to take as land. Which is to prevail, or who decide?

Our only remedy is, to bring an ejectment against the executor, and take the land into possession, if he will not sell; and then those interested may not agree to sell, and a partition follows. We come to this, then, that a person may have a right to land on which he can support an ejectment, nay, a real action, and which then will descend to his heirs; and yet, it can neither be levied on nor

(Morrow, for the use of the Heirs of Isett, *v.* Brenizer.)

sold. But any legal or equitable interest in lands, tenements, or hereditaments; all possible contingent interests; the right of widows to one-third of land taken at appraisement by children, may be taken in execution and sold. *Humphreys* v. *Humphreys,* 1 *Yeates,* 427. *Hurst* v. *Lithgrow,* 2 *Yeates,* 25. *Shaupe* v. *Shaupe,* 12 *Serg. & Rawle,* 9. *Clark* v. *Campbell and Williamson.* *Wampler* v. *Eckert,* and *Anderson and M'Cord* v. *Nesbit,* all occurred in this court.

In many thousand cases, the children, or some of them, have sold their interest in lands devised to be sold, and the money divided among them. These deeds have always been recorded, and hitherto supposed to pass the right to the land or the money; and the purchasers have sold again, or their creditors have sold by execution. But, by the present doctrine, the deed is unnecessary, and the recording illegal, and a copy from the record no evidence; for a deed of a sale of personal property is not injured by being put on record, but is not helped, even as to the preservation of its contents. A child, entitled to half of a large estate, is in debt; the executor may not choose to sell; the other children, or one of them, may forbid him; the child is imprisoned, and applies for the benefit of the insolvent law; assigns and is discharged; but still the creditor cannot get his money, for the assignees cannot compel the executor to sell; and they cannot sell, for there is no right in, or to the land; and yet, they could sell a reversion expectant on lives, or even on an estate tail.

But if the descent is broken, where does it leave the heir? He could not bring an ejectment against the executor refusing to sell. If the executor sells, and applies the money to his own purposes, the right of the heir to recur to the land is gone; the will it is said, destroyed it; but if he had a legacy charged on it, the legatee would be safe. A devisee of half the proceeds then, is worse off for all present and practical purposes, than any devisee of any specific legacy in the will, and, though a child, is less secure.

A man devises lands to be sold, one half of the proceeds go to his daughter; she marries and has two children, and dies; the husband marries again, and has ten children; one of the first wife's children dies, the land being yet unsold: if land, the brother of the full blood gets all; but being personal estate, he gets one-eleventh, and the rest goes to strangers to the blood under which it comes. This if the husband does not interfere; but on the death of his wife, it is the husband's, and he may give it all to the children of the second marriage, though it is still land; and then they may elect to keep it land; and the legal heirs of the devisee, portionless, see strangers the owners of land which would belong to them but for a fiction of the Court of Chancery in *England.*

In old settled and rich countries, lands are always improved, and can at all times be sold for a fair price. Here, the reverse is the case. In many parts of this state, a tract of land, which would be

(Morrow, for the use of the Heirs of Isett, *v.* Brenizer.)

the means of supporting a family, and a valuable estate when that family grows up, would now bring but a few dollars. One of the children may wish to take such a farm, at its selling price; another says, all must be sold; a third, sell none yet, lands will raise, &c. We have no court to decide or direct. If this court had power to decide, and could form and carry into execution a plan, this court is not that to which it belongs. Fifty-two Registers, or fifty-two Orphans' Courts, scattered over the state, are to adopt the system as they may successively hear of it, and carry it into effect, according to their respective notions of law and equity and public convenience; and by an isolated case, coming once a year before us, we can correct the error in that case; but in this way we can form no system, though we can increase the confusion and inconvenience.

I could pursue this for a week, and every result will produce any thing but justice to the family, or convenience to the community. The law has been held always, that while it continues land, the child sells its share as land, and the deed is recorded, and the purchaser has the right to the land, if not sold by the executor, or to the money if it is sold. So it has been levied on and sold. It has gone to the assignees of an insolvent debtor who have sold; and no inconvenience has been experienced, or is suggested. The change is made solely to conform to the law of *England* and *Virginia;* no matter if it deprives the children of any benefit from the estate of their father, or if it occasions that estate to be transmitted to strangers; or, if it injures creditors, as well as devisees; and it has none of the benefits derived from it in *England,* where it shuts out a class of creditors, if money is to be turned into land, or lets in all if the land is turned into money.

Judgment affirmed.