# The Pennsylvania Company for Insurance on Lives, &c. *versus* Dovey.

1. Where an instrument is formally sealed and delivered and there is nothing to qualify the delivery but keeping the deed in the hands of the executing party, or to show that he did not intend it to operate immediately, it is an effectual and valid delivery, and delivery to the party who is to take by it is not essential.

2. D. mortgaged his leasehold, he afterwards assigned it to H., who took in trust for a company thereafter to be formed, and covenanted to secure by mortgage to D. on the leasehold, the sum in the first mortgage which D. had paid: the company was organized; and a mortgage was executed by them leaving at the request of D. a blank for the name of the mortgagee, to be filled when D. should furnish the name: the mortgage remained in the hands of the company's attorney; the company gave another mortgage, which was recorded. D. afterwards had the blank filled up with his own name, not knowing that the other mortgage was recorded. *Held*, he was not bound to accept the mortgage.

3. It did not matter that the delay was at the request of D. and for his accommodation, and that the company was ready and willing at all times to complete the securities when he should demand it.

4. H. should have procured a tender by the company of the mortgage in the name of D.

5. When a debtor wishes to discharge himself from an action, an actual tender in the legal sense of the term, is necessary unless dispensed with.

6. A grant of the profits of the land is a grant of the land.

February 16th 1870. Before READ, AGNEW, SHARSWOOD and WILLIAMS, JJ. THOMPSON, C. J., at Nisi Prius.

Certificate from Nisi Prius: No. 193, to July Term 1868.

This was an action of covenant, brought July 20th 1868, by William Dovey against The Pennsylvania Company for Insurance on Lives, &c., administrators, &c., of William Hunter, Jr., deceased.

On the trial, before Sharswood, J., it appeared that on the 1st of May 1863, Jacob Alter and others leased a colliery to the plaintiff, he to mine, &c., at least 50,000 tons every year, ending November 30th, and pay to the lessors on the 10th of each month 25 cents per ton, &c. It was covenanted also that the lessee might retain one half of the rents less $10,000, and apply the same to the payment of $33,208 to the Philadelphia and Reading Railroad Company until that sum should be fully paid.

On the 1st of July 1863, Dovey the plaintiff, mortgaged the leasehold to the railroad company, covenanting that "from time to time, and whenever and as often as any sum or sums, the payment whereof is secured by this mortgage, shall have been due and payable for thirty days," the mortgagees may "issue a writ of scire facias, and have execution of the said premises for the amount so due with interest from the time the same ought to have been paid, in the same manner as if the whole debt secured by the said mortgage had been fully due and payable for the space of one whole year."

There was authority also for the confession of judgment for the amount which might be due at any particular time.

On the 14th of May 1864 the plaintiff contracted to sell to William Hunter, Jr., Josiah Caldwell and William Schafer, " to hold in trust for a company to be organized," the aforesaid leasehold, with the breakers, &c., and certain other real estate of the plaintiff for $171,000, of $25,000 which were paid down, Hunter and the

others agreeing to assume the contracts with the railroad company. A supplemental contract of June 1st 1864, provided for the transfer of the leases to the purchasers, and until then the plaintiff was to work the mines, and that when the transfers were executed Dovey should deliver possession to E. C. Bates and J. T. Bates, trustees, to whom the profits of working the mines from "this date" should be paid; Hunter and the other trustees first named to pay the plaintiff interest on $146,000, the remainder of the purchase-money.

On the 8th of July 1864, an indenture was executed between William Hunter, Jr., and Josiah Caldwell, of the first part, and the plaintiff of the second part. The deed recited the agreement to sell and transfer the leasehold, the purchasers to assume the contracts of the plaintiff with the railroad company, including the mortgage to that company of July 1st 1863, securing the payment of $33,208 out of the rents reserved in the original lease; and that it had been agreed that if the plaintiff would pay the same, the purchasers would secure the repayment thereof to him in the manner stipulated in the mortgage to the railroad company, and would pay to the plaintiff semi-annually interest on said sum, which agreements were "to be secured by bond and mortgage on the said leasehold," and would covenant for the payment of the principal sum and interest as above stated; it also recited that the $33,208 had been paid to the railroad company. The deed then covenanted as follows:—

"First. That until the corporation called the Mammoth Vein Consolidated Coal Company, which is about being organized, and to receive an assignment of the said leasehold property and premises, shall have received such assignment, and given to the said William Dovey or his assigns its obligation that there shall, in each and every year, be payable and paid to him, his executors, administrators or assigns, for and on account of the principal sum so paid by him, secured by a mortgage on the said leasehold estate, not less than $2360, until the whole of the principal sum of $33,208, with interest, shall have been fully paid and discharged, which obligation shall be given upon the organization of the said corporation, they, the parties of the first part, do jointly and severally covenant to and with the said William Dovey, his executors, administrators and assigns, that such sum shall be payable and paid to him or them, for and on account of the principal sum as aforesaid.

"Second. That when such obligation is given by the said the Mammoth Vein Consolidated Coal Company, then the said parties of the first part do jointly and severally covenant with the said William Dovey, his executors, administrators and assigns, that the said company shall and will faithfully perform their said obligation, and pay the said several sums of money at the time and

in the manner therein stipulated, and also the interest on the said sum of $33,208 at the times and in the manner stipulated in the mortgage of the parties of the first part, to him the said William Dovey."

The foregoing covenants are those on which their action is founded.

On the same day (July 8) Hunter and others entered into a mortgage with the plaintiff. The mortgage recited the original lease, the stipulation to pay the $33,208 to the railroad company; the mortgagors then covenanted that if any of the money should be due for thirty days, the mortgagee might issue a scire facias and have execution of the premises for the amount then due with interest, and that with warrant of attorney, &c., to confess judgment against the mortgagors for the amount then due, and levy the same out of the premises, &c.

The Mammoth Vein Consolidated Coal Company, the contemplated corporation, was incorporated August 22d 1864.

For the purpose of carrying out the stipulations of the agreement of July 8th 1864, between the plaintiff and Hunter and others, Caldwell, the plaintiff's counsel, on the 14th of April 1865, prepared a bond and mortgage, which on that day were executed by the coal company, with a blank for the name of the obligee and mortgagee, the plaintiff being desirous that the blank should be filled with the name of John J. Dovey. The papers were left in the hands of the attorney for the coal company until the consent of the lessors of the plaintiff could be obtained for the substitution of the name of John J. Dovey. The company authorized their attorney to insert the name when it should be agreed upon, and to put the mortgage on record.

On the first of August 1865 the Coal Company entered into an agreement with Charles G. Nazro and others, which recited a resolution of the company to issue bonds for $500,000, payable in five years, and assigned to Nazro and his associates "all the net revenue and income of them, the parties of the first part, and all the coal mined and to be mined from their coal estates, &c., and all the interest which they have and may lawfully assign in the coal breakers, &c. * * * In trust to receive all the net revenues and income, except such as may be necessary, in the judgment of the directors, to be retained for the proper management and development of the mines and apply them to the payment of interest on the bonds; to invest certain specified sums from time to time for the use of the bondholders, and to apply the surplus to pay dividends on stock. It being agreed that the trustees shall faithfully apply the moneys; and that the company shall mine and work their coal estates and collieries in accordance with the covenants in their leases, &c.

[Pennsylvania Co. for Insurance on Lives *v.* Dovey.]

This agreement was recorded in Schuylkill county, September 26th 1865.

In November 1865, Mr. Gibbons, the attorney of the company, handed the mortgage to Mr. McMurtrie, the attorney of the plaintiff, and authorized him to fill in the blank with the plaintiff's name, he not having been able to obtain the consent of the lessors to the substitution; the blank was thus filled.

Mr. McMurtrie, at the same time, gave Mr. Gibbons this paper:

"Memorandum. Mr. Charles Gibbons has given me the mortgage of the Mammoth Vein Coal Company to William Dovey for $33,200, to be recorded, and when it is ascertained there are no encumbrances on the mortgaged premises prior to the date of the recording of the mortgage, and the bond and warrant recited in the mortgage are delivered, I will surrender, cancelled, and will cause to be entered satisfaction on the mortgage from William Hunter and others to said Dovey, which has been thereby substituted.                         R. C. McMURTRIE.

November 16th 1865."

This mortgage was recorded November 29th 1865, in Schuylkill county.

On the 1st of December Mr. McMurtrie notified Mr. Gibbons that on sending the mortgage to be recorded, he found that the coal company had given a mortgage for $500,000 on their property, and he therefore could not satisfy the mortgage of July 8th 1864 from Hunter to the plaintiff.

On the 29th of the same month Mr. McMurtrie again wrote to Mr. Gibbons, referring to his memorandum and to the entry of the $500,000 mortgage, and saying:—

* * * "I am compelled to decline accepting this mortgage of the company as a substitute for the one held by Mr. Dovey, and as a performance of the contract in reference thereto, by which the purchasers from Mr. Dovey were to be absolved from their personal undertaking with him. * * * I must, therefore, give you notice on Mr. Dovey's behalf, that he declines accepting the proposed substituted mortgage, and will continue to look to the mortgage and other securities he received from the persons purchasing the leasehold from him. I therefore return the mortgage of the company which you propose to substitute under the contract, and will have such steps taken to relieve the company from the recording thereof as you may advise, consistent with the preservation of our existing mortgage."

On the 13th of January 1868, the plaintiff obtained judgment against the defendants on the mortgage of July 8th 1864 to him, under which the property was sold to Alter and others, the original lessors, for $100.

The defendants submitted five points, which it is not necessary to give.

Judge Sharswood charged :—

* * * "If Mr. Hunter was desirous for any reason that his own obligation, or covenant and mortgage, should be changed into an obligation and mortgage by the corporation, as to which however, when executed and accepted, he would still continue liable for the fulfilment, it was incumbent on him to prepare and tender to Mr. Dovey an obligation and mortgage by the corporation, pursuant to the terms of the covenant. This there is no evidence that he did; nor is there any evidence that such tender was dispensed with till after September 25th 1865, when an instrument, dated August 1st 1865, was recorded in Schuylkill county, executed by the Mammoth Company, which assigned to trustees, as security for the payment of bonds to the amount of $500,000, ' all the coal mined and to be mined from their coal estates in the counties of Schuylkill and Northumberland.' [After the execution and recording of that instrument, Mr. Dovey was not bound to accept the mortgage and obligation of the Mammoth Coal Company.] By so doing, he would necessarily have surrendered and released the mortgage he already held of July 8th 1864, from Mr. Hunter to him, which was a prior lien, and the new mortgage taken would have been second and subordinate to that executed in favor of the trustees for the bondholders.

"I say to you, therefore, that [there is no evidence that Mr. Hunter tendered to Dovey prior to September 1865, any mortgage or obligation pursuant to the terms of that covenant.] It appears, from the admitted facts, that on April 14th 1865, a bond and mortgage prepared by the counsel of Mr. Dovey, were executed by the corporation, with a blank for the name of the obligee and mortgagee; but these papers, by amicable arrangement, were left in the possession of the Mammoth Vein Company undelivered and unaccepted, until Mr. Dovey should be able to secure the consent of the lessors for the substitution of the name of John J. Dovey, as obligee and mortgagee, instead of that of William Dovey. The Mammoth Coal Company never tendered a mortgage and obligation to William Dovey until November 1865, when he refused to accept it. It is clear to my mind, that [the transaction amounted to nothing on the part of the corporation until November 1865.] They agreed all around to wait; and if, in the meantime, by their own act, in the execution of the assignment of August 1st 1865, they had incapacitated themselves from making such a mortgage as was contemplated by the covenant, the consequences must fall on Mr. Hunter, who had covenanted that they would execute such a mortgage.

"It is not surprising, perhaps, that this apparent indifference about the completion of the matter was manifested. The position, neither of Mr. Hunter nor the Mammoth Vein Company, was materially changed by the giving of the bond and obligation.

[*Pennsylvania Co. for Insurance on Lives v. Dovey.*]

Mr. Hunter, under his covenant, would still continue responsible as before, and the Mammoth Coal Company, who had received an assignment of the leasehold, subject to the mortgage of Hunter to Dovey, was undoubtedly liable. The only interest was on Mr. Dovey's side, for he would thereby procure the direct obligation of the company to him so far as that and the accompanying mortgage might be available for sale in the market.

"There was nothing then done till November 16th 1865; and what was then done, or offered to be done, was not a compliance with the covenant.

"I instruct you, therefore, to render a verdict for the plaintiff for the amount of the instalments due upon the covenants at the time of the commencement of this action, with the semi-annual payments of interest on the whole sum due and unpaid at that time. As this instruction covers the whole case, it is unnecessary that I should answer the several points on which I have been requested to charge by the plaintiff and defendants."

The verdict was for the plaintiff for $7283.92.

The defendants took a writ of error. They assigned nine errors: the 1st, 2d and 3d, were the portions of the charge included in brackets.

*W. F. Judson* and *C. Gibbons*, for plaintiffs in error.—The question of the delivery of the mortgage was for the jury: Critchfield *v.* Critchfield, 12 Harris 102; Allen *v.* Getz, 2 Penna. R. 310. Retaining the mortgage by the counsel of the mortgagor did not conclusively rebut the presumption of delivery arising from its execution and acknowledgment: Blight *v.* Schenck, 10 Barr 285; Garnons *v.* Knight, 5 B. & C. 671; Lloyd *v.* Bennett, 8 Id. 124; Wheelwright *v.* Wheelwright, 2 Mass. R. 452; Murray *v.* Earl of Stair, 2 B. & C. 82.

*R. C. McMurtrie*, for defendant in error.

The opinion of the court was delivered, February 28th 1870, by

SHARSWOOD, J.—The 4th, 5th, 6th, 7th and 8th alleged errors not being assigned according to rule must be dismissed. Indeed, none of them have been insisted on here, as the principles upon which they rest are involved in the first three assignments. These present only two questions. First. Whether there was any evidence that Hunter had tendered to Dovey prior to September 1865, or had procured to be tendered a mortgage and obligation of the Mammoth Vein Coal Company, pursuant to the terms of his covenant of July 8th 1864, as set forth in the declaration? Second. Whether Dovey was bound to accept the mortgage and obligation tendered in November 1865?

Had the obligation and mortgage, executed and acknowledged

by the Mammoth Vein Coal Company on April 14th 1865, been complete and perfect instruments, then indeed the principle of Blight v. Schenck, 10 Barr 285, might have required that the question, whether there had been a delivery or tender, should be submitted to the jury. That case recognised the doctrine that where an instrument is formally sealed and delivered, and there is nothing to qualify the delivery but the keeping of the deed in the hands of the executing party, nothing to show that he did not intend it to operate immediately, that it is a valid and effectual deed, and that delivery to the party who is to take by it, or any other person for his use, is not essential. But the instruments executed and acknowledged in this case were imperfect—not such as Dovey was bound to accept—and no presumption of his having accepted them could therefore arise, as in Wilt v. Franklin, 1 Binn. 502. A blank was left for the name of the obligee and mortgagee. It would have been necessary to show an express agreement to accept them in this imperfect state. There was no evidence of this, but, on the contrary, the evidence was that the papers were left in the hands of the counsel of Hunter to be perfected thereafter, when Dovey could obtain the assent of the original lessors, which was necessary to the substitution of some other name than his own. This, however, he failed to procure. It matters not that this was at Dovey's request, and for his accommodation, and that the company were ready and willing at all times to complete the securities whenever he should demand it. If Hunter wished to bring the matter to a close, he ought to have procured the company to tender the instruments filled up with the name of Dovey, according to the stipulation of his covenant. Readiness and willingness were not enough. "Where a debt is due on a contract executed," says Lewis, C. J., "and the party to whom it is payable is entitled to it without the performance of anything on his part, and the object of the debtor is to discharge himself from an action for it, an actual tender, in the legal sense of the term, is necessary unless dispensed with:" Williams v. Bentley, 3 Casey 294.

We may assume that there was an actual tender November 16th 1865, but the memorandum of Mr. McMurtrie, as counsel for Dovey, shows that there was then no acceptance. The only question, therefore, is whether there was any right to refuse? It appears that on August 1st 1865 the Mammoth Vein Coal Company had executed a mortgage to certain persons in trust to secure bondholders of all their "net revenue and income, and all the coal mined and to be mined from their coal estates in the counties of Schuylkill and Northumberland," which mortgage in the mean time had been duly recorded. This mortgage was without any question an encumbrance on the leasehold interest included in that of April 1864, tendered in November 1865 to Dovey. A

[Pennsylvania Co. for Insurance on Lives *v.* Dovey.]

grant of the profits of the land is a grant of the land itself: 1 Inst. 4 b. It has been contended, however, that the execution and delivery of a new mortgage, effectual as a lien, was not required by the terms of the covenant. The words are, "its obligation secured by a mortgage on the said leasehold estate." It is said that as Dovey was not required to satisfy the existing mortgage for the same debt held by him, it would still have remained as a security for the new obligation. But the fallacy of this argument is apparent. The mortgage of July 8th 1864 was to secure the obligation of Hunter as principal debtor: the substituted obligation was that of a different party, for whom he was to stand as guarantor. The first obligation would have been at an end by the delivery and acceptance of the second, and it is very plain that the first mortgage, being merely accessary and collateral, would have followed the fate of the principal obligation, and indeed could not by the agreement of the parties by parol have been converted into a mortgage or security for the second, and perhaps even a written and recorded covenant to that effect could not have kept it alive as against intermediate purchasers and mortgagees: Bowers *v.* Oyster, 3 Penna. Rep. 239; Metz *v.* Dieffenbach, 3 Barr 233.

Judgment affirmed.